**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:17-cv-02193-KMT

DEBBIE GORDILLO,

      Plaintiff,

v.

UNIVERSITY OF COLORADO BOARD OF REGENTS, A BODY CORPORATE; AND
RANDY SIDERS, INDIVIDUALLY

      Defendant.

---

**RESPONSE TO DEFENDANT RANDY SIDERS' MOTION TO DISMISS UNDER
F.R.C.P. 12(b)(1)**

---

      Plaintiff Debbie Gordillo through her attorney, Rachel E. Ellis of Livelihood Law, LLC,

submits this Response to Defendant Randy Siders' (herein after Defendant or Mr. Siders) Motion

to Dismiss, and states as follows:

## I. INTRODUCTION

      Defendant was named individually in this lawsuit as a result of his interference with Ms.

Gordillo's employment. The heart of the issue here is how Mr. Siders acted, in connection with

what he knew. The facts, contained within and in addition to the Complaint, demonstrate that Mr.

Siders was not "just doing his job," as the Motion at issue claims, but rather, he knew of Ms.

Gordillo's concerns about mold, her fear that either she or her daughter would become gravely ill

from the SPSC like another LASP employee, and his decision that Ms. Gordillo must be relocated

to the SPSC despite his knowledge.

1

## II. FACTS

### A. Response to Defendant's Facts ("DF")

Plaintiff does not dispute DF 1-2, 4-9, 11, 14, 16, and 19. To a point, Plaintiff does not disagree with DF 3, however, there is a glaring omission of information regarding the characterization of safety, as explained in PF # 13-17, 19, 22-25, 27-29, *infra.*, and therefore disputes the impermissible inference of safe working conditions requested by Defendant.

DF 10, 12-13, 15, and 17-18 relate to the organization of front desk personnel in connection with scheduling and coverage. For the reasons identified in PF 1-11, *infra.*, Plaintiff disputes Defendant's characterization that the alleged desire to reorganize personnel was not pretextual. PF 4, 5, 7-11, 30, *infra.*, would permit a reasonable juror to infer that Defendant was desperate to eliminate any continued discussion of mold safety issues in the SPSC, especially in light of the coverage problems that terminating Ms. Gordillo caused.

Plaintiff disputes DF 20-23 for the reasons identified in PF 5-7, 17, 19-24, *infra.*; key information is omitted which is necessary for context.  A reasonable inference in light of the totality of the circumstances would be that Ms. Gordillo's reaction to being asked to relocate to the SPSC was warranted.

DF 24 is immaterial, in that Defendant is impermissibly requesting an inference that the placement of a new receptionist at the SPSC indicates the lack of willful and wanton interference with Ms. Gordillo's employment.

### B. Plaintiff's Facts ("PF")

1.      For most of her employment at LASP, Ms. Gordillo had a great working relationship with Mr. Siders. Ex. 2, Gordillo Dep. Excerpts, pp. 24:15-19.

2.      Mr. Siders stopped by Ms. Gordillo's desk daily for five to thirty minutes to chat. Ex. 2, pp. 24:20-25:8. Ex. 3, Randy Siders Dep. Excerpts, pp. 72:8-11.

3.      A few weeks prior to Ms. Gordillo's termination, her relationship with Mr. Siders abruptly changed, when Mr. Siders witnessed a hug between Ms. Gordillo and Mike McGrath. Ex. 2, pp. 27:22-28:20.

4.      Mr. McGrath had given Ms. Gordillo a hug, to be supportive, after she disclosed her daughter's diagnosis to him. Ex. 2, pp. 28:12-20 and 31:1-15.

5.      Ms. Gordillo had told Mr. Siders, in August of 2015, that her daughter, Nicolette, was diagnosed with "CIRS, chronic inflammatory response syndrome, which is an autoimmune issue that is triggered directly by being in a water-damaged building." Ex. 2, pp. 31:18-22 and 59:12-61:21.

6.      Ms. Gordillo explained to Mr. Siders what the diagnosis meant. Ex. 2, pp. 62:9-13.

7.      Ms. Gordillo felt that awareness about her daughter's diagnosis was important and could be applicable to other employees and their families, so she shared with everyone at LASP: Cheryl Haugen, Mr. Siders, Directors, receptionists, employees with sick children, and custodians. Ex. 2, at pp. 59:12-64:5.

8.      After the hug, the change in Mr. Siders' treatment toward Ms. Gordillo was "very clear." Ex. 2, pp. 28:15-16.

9.      Mr. Siders stopped passing by and visiting Ms. Gordillo. Ex. 2, pp. 24:20-25:1.

10.     After Mr. Siders witnessed the hug, he was not happy about it and, according to CU employee Vincent Guarino, he was "quite enraged and outraged and upset and highly upset about witnessing it." Ex. 2, pp. 38:7-39:14.

11.    And other CU employees recognized that Mr. Siders treated Ms. Gordillo differently after witnessing the hug. Ex. 2, pp. 46:2-22.

12.    Mr. Siders now denies knowing about Nicolette's illness. Ex. 3, pp. 73:20-74:8; Ex. 2, pp. 31:18-22, 59:12-61:21, and 62:9-13.

13.    Mr. Siders knew about several employees' complaints about mold and water damage to the SPSC, including Ms. Haugen, an employee who resigned from LASP due to her illness caused by mold exposure in the water-damaged building. Ex. 3, pp. 39:25-40:16 and 43:11-22.

14.    Defendant knew that Ms. Haugen continued to struggle with her illness caused by mold exposure in the water-damaged building after "independent" tests determined that the water-damaged building was "normal." Ex. 3, pp. 62:17-64:1.

15.    Mr. Siders insists that he openly shared mold testing information with management level employees. Ex. 3, pp. 116:5-117:20.

16.    However, Mr. Siders did not communicate any information to Mr. McGrath, who was the Director of Engineering and the Program Manager for the Emirates Mission to Mars Program, about mold or any inspections of the SPSC. Ex. 4, Mike McGrath Dep. Excerpts, pp. 26:20-27:12; Ex. 3, 92:19-22.

17.    Ms. Gordillo never refused to move and only asked that additional testing be completed to confirm it was a safe place for her and her daughter to be. Ex. 2, pp. 114:25-115:5 and 146:2-10.

18.    Mr. Siders believed Ms. Gordillo refused to move to the SPSC.  Ex. 3, pp. 105:20-109:6.

19.     The SPSC was the same location where Ms. Haugen was exposed to mold, and Mr. Siders was handling the resignation of Ms. Haugen due to her mold-related illness at the same time that Plaintiff's termination was swiftly manufactured. Ex. 3, pp. 62:17-64:1.

20.     Ms. Rogers and Mr. Guarino told Mr. Siders that Ms. Gordillo refused to move because of health reasons, but also said they didn't know what those reasons were. Ex. 3, pp. 108:7-18.

21.     Ms. Gordillo told Ms. Rogers and Mr. Guarino that she "had concerns about being moved to the SPSC building for health reasons" for herself and her daughter. Ex. 2, pp. 114:25-115:5.

22.     Ms. Gordillo was waiting for Ms. Rogers to "get back to [her]" regarding more information about the mold remediation efforts at the SPSC. Ex. 2, pp. 115:10-116:22.

23.     Ms. Rogers never got back to Ms. Gordillo. Instead, Ms. Rogers asked for proof of Nicolette's illness, which Ms. Gordillo had no problem providing—except that she was fired before she had an opportunity to provide such documentation. Ex. 2, pp. 116:23-118:19.

24.     Ms. Gordillo was concerned that she and Nicolette might suffer the same fate as Ms. Haugen, and simply wanted a little more information to make sure that relocating to the SPSC wouldn't jeopardize her or her daughter's health. Ex. 2, pp. 120:8-122:9.

25.     Ms. Haugen submitted her resignation on July 21, 2015, because of the long-standing unresolved water intrusion problem with the SPSC, and because the mold had been making her very sick for months. Ex. 5, Dep. Exhibit 3.

26.     From September 8, 2015 through September 14, 2015, Mr. Siders was working with Human Resources to lock down Ms. Haugen's resignation. Ex. 6, Dep. Exhibits 34 and 36.

27.     CU owned the building and was responsible for getting the mold inspection done, and LASP had to go through CU.  Ex. 3, pp. 54:10-20.

28.     It was tested according to the Industry Standard, which means there was a baseline amount of mold. Even the environmental health firm who completed the initial analysis recommended going above and beyond the industry standard testing.  Ex. 3, pp. 55:8-56:3; Ex. 7, Dr. Eric Dorninger Dep. Excerpts, pp. 69:1-25 and 71:7-17; Ex. 8, Dep. Exhibit 35.

29.     More testing was being recommended as of August 10, 2015.  Ex. 8.

30.     The replacement for Ms. Gordillo did not begin until November or December, requiring LASP to use other employees to fill the gap, and reprioritization of ongoing work for more than a month.  Ex. 3, pp. 125:18-26:24; Ex. 9, Dep. Exhibit 41.

31.     If Ms. Rogers hadn't insisted that Ms. Gordillo be fired, Mr. Guarino would have tried to work something out.  Ex. 10, Vince Guarino Dep. Excerpts, pp. 78:17-22.

### III. STANDARD OF REVIEW

F.R.C.P. 12(b)(1) empowers a court to dismiss a complaint for "lack of jurisdiction over the subject matter." Fed. R. Civ. P. 12(b)(1). "Dismissal under Rule 12(b)(1) is not a judgment on the merits of a plaintiff's case." *Johnson v. W. State Colo. Uni.*, 71 F. Supp. 3d 1217, 1220 (D. Colo. 2014) (citing *Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir. 1994) (recognizing federal courts are courts of limited jurisdiction)) (emphasis added). "Rather, it calls for a determination that the court lacks authority to adjudicate the matter, attacking the existence of jurisdiction rather than the allegations of the complaint." *Id.* at 1220.

"A claim of sovereign immunity implicates the Court's subject-matter jurisdiction." *Carani v. Meisner*, 2009 WL 2762719, at *2 (D. Colo. Aug. 26, 2009). It is Plaintiff's burden to plead facts sufficient to allege that Defendant's conduct was "willful and wanton" so as to take him "outside the protection of the CGIA." *Id.* "In any action alleging that an act of public

6

employee was willful and wanton, 'the specific factual basis of such allegations shall be stated in the complaint.'" *Castaldo v. Stone*, 192 F. Supp. 2d 1124, 1139 (D. Colo. 2001); Colo. Rev. Stat. § 24-10-110(5)(a). "Failure to plead the factual basis results in dismissal for failure to state a claim upon which relief can be granted." *Id.* at § 110(5)(b). "Whether a plaintiff has pleaded sufficient facts to state a claim based upon willful and wanton conduct is a matter determined by the court." *Castaldo*, 192 F. Supp. 2d at 1139 (citing *Barham v. Scalia*, 928 P.2d 1381, 1385 (Colo. App. 1996)).

Courts in this district have applied Colorado law to construe the meaning of "willful and wanton" as it is used in the CGIA. These courts hold that for a "defendant's conduct to be 'willful and wanton' under the CGIA, [the] defendant must be adequately alleged to have purposefully pursued a course of action or inaction that he or she considered would probably result in the harm to [the p]laintiff[]." *Castaldo*, 192 F. Supp. 2d at 1141 (collecting Colorado authority); *Romero v. Denver Pub. Sch., Dist. No. 1*, 2010 WL 1235635, at *4 (D. Colo. Mar. 18, 2010) (same); *Carani*, 2009 WL 2762719 at *2 (same).

A public employee's actions are willful and wanton when the employee is "consciously aware that their acts or omissions create danger or risk to the safety of others, and they then act, or fail to act, without regard to the danger or risk." *L.J. v. Carricato*, 2018 COA 3, ¶ 33, 413 P.3d 1280, 1288.

## IV. ARGUMENT

### A. Allegations made in the Complaint are evidence that Mr. Siders acted in a willful and wanton manner.

"In any action alleging that an act of public employee was willful and wanton, 'the specific factual basis of such allegations shall be stated in the complaint.'" *Castaldo*, 192 F.

Supp. 2d at 1139; Colo. Rev. Stat. § 24-10-110(5)(a). "Failure to plead the factual basis results in dismissal for failure to state a claim upon which relief can be granted." *Id.* at § 110(5)(b). "To do so, a plaintiff must 'set forth facts to support a reasonable inference that [the defendant] recklessly disregarded the consequences of her actions.'" *McDonald v. Wise*, 769 F.3d 1202, 1218 (10th Cir. 2014) (quoting *Wilson v. Meyer*, 126 P.3d 276, 282 (Colo. App. 2005)); *see also Anderson v. Shutter*, 2018 WL 2948221, at *4 (D. Colo. June 13, 2018) (citing *L.J. v. Carricato*, 2018 COA 3, ¶ 33). "[W]hen there are disputed issues of fact, a well pleaded claim asserting that an employee acted willfully and wantonly must await determination at trial on the merits." *Barham*, 928 P.2d at 1381.

Here, Plaintiff pleaded the specific factual basis for alleging that Defendant acted willfully and wantonly towards Plaintiff. When a former CU employee resigned because she suffered from debilitating health problems related to mold at the water-damaged SPSC, Defendant was dismissive of the employee's concerns and said to Plaintiff that "he didn't believe that mold could be causing health problems." Compl., at ¶¶ 15-16. Thereafter, Plaintiff's own daughter was diagnosed with biotoxin illnesses caused by exposure to mold from water-damaged buildings. *Id.* ¶ 17. Plaintiff told Defendant about her daughter's mold related illness, and explicitly shared that her symptoms were specifically triggered by exposure to mold from water-damaged buildings. *Id.* ¶¶ 17-18. On Thursday, September 3, 2015, Plaintiff applied for FMLA leave to take care of her daughter. *Id.* ¶ 19. Two work days later, on Tuesday, September 8, 2015, Plaintiff was notified that she would be moving to the SPSC building, effective September 14, 2015. *Id.* ¶ 22. Defendant changed the terms and conditions of Plaintiff's employment so that she would be moved to the SPSC building. ¶ 55. Given Defendant's dismissive attitude towards

the CU employee with a mold-related illness and the close proximity between Defendant's dismissive attitude, Defendant's knowledge of Plaintiff's daughter's mold-related illness, and Defendant's decision to move Plaintiff to the same water-damaged building causing the CU employee's mold-related illness, Plaintiff's alleged factual basis supports a reasonable inference that Defendant recklessly disregarded the consequences of his actions.  *McDonald*, 769 F.3d at 1218.

**B.  Additional evidence outside the Complaint shows Mr. Siders acted willfully and wantonly.**

Under F.R.C.P. 12(b)(1), the Court is permitted to consider matters outside the pleadings without transforming the motion into one for summary judgment. *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995). Here, the record is replete with disputed issues of material fact as to whether Defendant acted willfully and wantonly. At the minimum, these issues of material fact support a reasonable inference that Defendant knew moving Plaintiff to the SPSC would cause her harm and he consciously disregarded such risk or harm.

First, issues of fact exist as to whether Defendant changed his attitude, demeanor, and professional relationship with Plaintiff upon learning that Plaintiff's daughter was diagnosed with an immune illness caused by mold exposure in water-damaged buildings. Plaintiff felt that for most of her employment at LASP, she had a great working relationship with Defendant. PF #1. Defendant stopped by Plaintiff's desk daily for five to thirty minutes to chat. PF #2. At a certain point, that relationship changed at least a few weeks prior to Plaintiff's termination. Plaintiff believed that her relationship with Defendant changed after Defendant witnessed Mike McGrath give her a hug. At the time of the hug, Plaintiff also informed Mr. McGrath about her daughter's diagnosis.  PF #3 & 4. Plaintiff testified that, before the hug, in August of 2015, she told Defendant

that her daughter was diagnosed with "CIRS, chronic inflammatory response syndrome, which is an autoimmune issue that is triggered directly by being in a water-damaged building." PF #5. And Plaintiff explained what the diagnosis meant to Defendant. PF #6. Ms. Gordillo also told other employees about her daughter's diagnosis. PF #7.

After the hug, the change in how Defendant treated Plaintiff was "very clear." PF #8. Defendant stopped passing by and visiting Plaintiff. PF #9. After Defendant witnessed the hug, he was not happy about it and, according to CU employee Vincent Guarino, he was "quite enraged and outraged and upset and highly upset about witnessing it." PF #10. And other CU employees recognized that Defendant treated Plaintiff differently after witnessing the hug. PF #11.

Next, a genuine dispute of material fact exists as to whether Defendant knew about Nicolette's diagnosis. Despite the fact that Plaintiff has consistently testified and represented that she told Defendant about Nicolette's illness, which is exacerbated by mold exposure in water-damaged buildings, Defendant denies such knowledge. PF #12. A genuine dispute of material fact exists. Defendant's knowledge of Nicolette's illness goes directly towards whether the jury can infer that Defendant's decision to move Plaintiff to the water-damaged building was willful and wanton and done with a conscious disregard for the danger and harm that it would cause Plaintiff. This is a credibility determination reserved for the jury.

The importance of whether Defendant knew about Nicolette's diagnosis is critical. Defendant knew about several employees' complaints about mold and water damage to the SPSC, including Ms. Haugen, an employee who resigned from LASP due to her illness caused by mold exposure in the water-damaged building. PF #13. Defendant knew that Ms. Haugen continued to struggle with her illness caused by mold exposure in the water-damaged building after

"independent" tests determined that the water-damaged building was "normal." PF #14.  Further, an inconsistency exists in that Defendant insists that he openly shared information related to the mold testing that was being done, but Mr. McGrath was never notified, and Ms. Gordillo was denied this information. PF #15-17.

These two facts support the inference that Defendant knew that moving Plaintiff's place of employment to the SPSC would cause risk or harm to Plaintiff. Taking as true Plaintiff's statement that Defendant knew about Nicolette's illness, which is exacerbated by mold exposure in water-damaged buildings, and he knew that the SPSC was water-damaged and incurred mold damage that caused harm to other CU employees, a jury should determine whether these facts exist and decide whether Defendant knew that moving Plaintiff's place of employment to the water-damaged SPSC would cause risk or harm to Plaintiff. And, therefore, a jury should decide whether Defendant's decision to move Plaintiff to the SPSC was willful and wanton.

Further, there is an undeniable dispute of material fact as to whether Plaintiff refused to move to the water-damaged SPSC building. Defendant testified that he believed Plaintiff refused to move to the SPSC. PF #18. Plaintiff testified that she never refused to move and only asked that additional testing be completed to confirm it was a safe place for her and her daughter to be. PF #18. Indeed, it was the same location where mold caused illness to Ms. Haugen who was still suffering from her mold-related illness near the same time that Plaintiff was terminated. PF #19.

Additionally, the record is littered with disputed material facts as to whether Defendant knew that Plaintiff requested additional testing be completed prior to her considering the SPSC move. PF #20. In contrast, Plaintiff testified that she told Ms. Rogers and Mr. Guarino that she

"had concerns about being moved to the SPSC building for health reasons" for herself and her

daughter. PF #21. Plaintiff testified:

> Q. [By Ms. Weston]  Okay. What did you tell them about the health reasons?
>
> A. [By Debbie Gordillo]  That my daughter had an autoimmune illness that was related to -- called CIRS, C-I-R-S, chronic inflammatory response syndrome, which is an autoimmune illness that is triggered by being in a water-damaged building and that I was aware that the building had serious, serious, serious water damage. I had seen Cheryl's health decline from working in that building. I had seen that the remediation was not complete. Cheryl stated that her office had visible mold in it. The -- I was told by several people that the -- I don't remember the name of the people that were on the third floor in the building -- or third or fourth floor of the SPSC building. They had signed a lease, and I think they were like a disaster recovery insurance company or something like that; and they were on that floor. I think they had to break their lease, and I don't think they were happy with the remediation as well. I think there was visible mold on their floor as well. So I have no reason to believe that the remediation was done on that building.
>
> Q. Did Susan tell you – what did Susan tell you about the condition of the building, if anything?
>
> A. She said it was fully remediated.
>
> Q. Did you --
>
> A. I asked -- I asked for evidence and proof of that.
>
> Q. And that was during the meeting on the 9th?
>
> A. Yes.
>
> Q. And did she give it to you?
>
> A. No.
>
> Q. What did she say?
>
> A. She – her response to everything that was said was, We'll get back to you.

PF #22. Ms. Rogers never got back to Plaintiff. Instead, Ms. Rogers asked for proof of Nicolette's

illness, which Plaintiff had no problem providing—except that she was fired before she had a

12

chance to provide such documentation. PF #23. Plaintiff expressed concern that she and Nicolette might suffer the same fate as Ms. Haugen. Plaintiff thought she was going to be given time to evaluate the situation and consider the health of herself and her daughter. She was not given time. She was fired. PF #24. As a result, material facts exist and permit a reasonable jury to determine whether Defendant acted willfully and wantonly towards Plaintiff. Accordingly, Defendant's Motion to Dismiss should be denied.

### C. There is a material dispute as to whether Mr. Siders was simply performing his job, or was consciously aware of the risk.

In *Anderson*, the defendant-law enforcement officer was required to inform the Court about the plaintiff's 2009 juvenile case at plaintiff's bond reduction and sentencing hearings, which squarely falls within the duties of a law enforcement officer. *Anderson*, 2018 WL 2948221, at *4. In that case, plaintiff "present[ed] no allegations that Defendant was 'consciously aware' that disclosing the 2009 case to the Court in a public hearing or otherwise would risk Plaintiff re-living [his] harms." *Id.* at *5. In *Tatten v. City and Cnty. of Denver*, 2017 WL 5172244, at *2 (D. Colo. Feb. 3, 2017), defendant-public trustee was required by a Court's Order to conduct the foreclosure sale of plaintiff's property. *Id.* at *12. Again, there was no evidence or allegations that defendant "exhibit[ed] a conscious disregard for the danger" or risk to plaintiff. *Id.* Nothing in these cases establishes the proposition that any employee who exercises discretion in their job is precluded from acting willfully and wantonly for purposes of the CGIA.

Further, it was the same mold-related illness that caused another CU employee who worked at that same building to resign, and her resignation process was occurring <u>at the same time</u> Defendant considered terminating Plaintiff when she was requesting more information about the mold situation at the SPSC. PF #17, 19, 25- 26. And Defendant knew all of that, in addition to

knowing that three other employees complained about mold at the SPSC, and that though mold testing had been done, more was recommended on August 10, 2015. PF #13-14, 25-29.

Though Defendant was consciously aware of all of these facts, he still assigned Plaintiff to the previously water-damaged building. This decision took place soon after Plaintiff expressed concern about her daughter's condition being exacerbated by mold in water-damaged buildings, which had resulted in Defendant changing his interaction and behavior with Plaintiff.  PF# 1-11. These facts support a reasonable inference that Defendant knew such a location change would cause emotional and mental harm to Plaintiff and Defendant acted accordingly without regard to the dangers or risk.

The shortage in front desk coverage was not resolved until November or December, and Plaintiff's replacement was officially hired in February of 2016.  There is no apparent reason by Defendant couldn't have permitted Plaintiff to submit and receive additional information in order for an assessment of whether it was safe for her to work in the SPSC.  PF #30-31.

Here, neither an employment duty nor Court order required Defendant to re-assign Plaintiff to the water-damaged SPSC. Rather, Defendant exercised discretion. Without soliciting feedback or attempting to address Plaintiff's concerns, Defendant proposed the relocation of Plaintiff to a building with known mold issues and made this proposal within a month of Defendant learning that Plaintiff's daughter, Nicolette, suffered from an illness that was caused by mold in water-damaged building. Not only was Defendant not required to move Plaintiff to the SPSC, but there is also sufficient evidence and allegations supporting a reasonable inference that Defendant acted willfully and wantonly towards Plaintiff.

**CONCLUSION**

Governmental immunity should not shield Defendant Siders from responsibility for his willful and wanton actions.  The logical inferences drawn from the evidence provided do not indicate that he was simply "doing his job" when he interfered with Plaintiff's employment.

WHEREFORE, For the above reasons, Plaintiff respectfully requests the Court deny Defendants' Motion to Dismiss in its entirety.

Respectfully submitted this 21st day of September, 2018.

*s/ Rachel E. Ellis*_____
Rachel E. Ellis
Livelihood Law, LLC
3401 Quebec Street, Suite 6009
Denver, Colorado 80207
Phone: (720) 465-6972
ree@livelihoodlaw.com
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I certify that on September 21, 2018, the foregoing RESPONSE TO DEFENDANT RANDY SIDERS' MOTION TO DISMISS UNDER F.R.C.P. 12(b)(1) was filed with the CM/ECF electronic filing system, which will automatically notify Defendant by email as follows:

Erica Weston
erica.weston@cu.edu

Donald A. Kaade
donald.kaade@cu.edu

*s/ Amber Klein*_____
Amber Klein