**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:17-cv-02193-KMT

DEBBIE GORDILLO,

      *Plaintiff,*

v.

UNIVERSITY OF COLORADO BOARD OF REGENTS, A BODY CORPORATE; AND RANDY SIDERS, INDIVIDUALLY

      Defendant.

---

**PLAINTIFF'S RESPONSE TO DEFENDANT THE UNIVERSITY OF COLORADO BOARD OF REGENTS' MOTION FOR SUMMARY JUDGMENT**

---

COMES NOW Plaintiff Debbie Gordillo, by and through her counsel of record, and submits the following Response to Defendant the University of Colorado Board of Regents' Motion for Summary Judgment.

## I.      INTRODUCTION

This case arises out of the unlawful termination of Plaintiff Debbie Gordillo from Defendant University of Colorado Board of Regents ("Defendant"), in violation of the Family and Medical Leave Act ("FMLA") under both interference and retaliation theories.

Summary judgment is particularly inappropriate in this case because Ms. Gordillo is able to meet the elements of her claims, and the credibility of Defendants' allegedly legitimate business reasons for terminating Ms. Gordillo's employment is very much at issue. Defendant is

1

requesting impermissible inferences in its own favor, and ignoring a vast amount of evidence which supports Ms. Gordillo's theories of the case.

## II.  FACTS

### A. Response to Defendant's Facts ("DF")

Plaintiff does not dispute Defendant's Facts ("DF") #1, 3-7, 10, 15, 18, or 20.  DF #24 is immaterial, in that Defendant is impermissibly requesting an inference that the placement of a new receptionist at the SPSC indicates both permissible business judgment and the lack of willful and wanton interference with Ms. Gordillo's employment; however, as discussed in depth in Plaintiff's Response to Defendant Randy Siders' Motion to Dismiss Under F.R.C.P. 12(b)(1) [Dock. No. 23], and PF #49, *infra*, neither inference is appropriate.

Plaintiff disputes DF #2, based on PF #16-20, and 24, because Defendant mischaracterizes the SPSC as being free from mold, when additional testing was being recommended.  DF #8-9, 11-14, and 16-17 relate to the organization of front desk personnel in connection with scheduling and coverage. For the reasons identified in PF #1-11 and 30 of Plaintiff's Response to Defendant Randy Siders' Motion to Dismiss Under F.R.C.P. 12(b)(1) [Dock. No. 23], Plaintiff disputes Defendant's characterization that the alleged desire to reorganize personnel was not pretextual.

Plaintiff disputes DF #19 and 21-23 for the reasons identified in PF #1-10, 19-20, 26-36, 39-40, 42-43, and 45-47, *infra.*; key information is omitted which is necessary to understand the details CU was aware of, and Ms. Gordillo's response.

DF #25 is misleading. PF #45 and 48, *infra.*, explain why Nicolette's job at LASP was possible: she never went into the SPSC.

**B. Plaintiff's Facts ("PF")**

1.     For the relevant time period, Tracee DeAntoni was the FMLA Specialist on the Employee Relations team, and the person that LASP employees were supposed to go to with FMLA questions.  Ex. 2, DeAntoni Dep. Excerpts, p. 11:1-18.  On August 26, 2015, Ms. DeAntoni was notified by LASP HR that Ms. Gordillo had questions about health insurance and FML for her daughter, Nicolette. Ex. 3, Key Documents at CU_7, CU_29-31, CU_0999; Ex. 2, pp. 30:9-32:25.

2.     Ms. Gordillo met with Ms. DeAntoni about FML on September 3, 2015, received paperwork to apply for FML on September 9, 2015, and was terminated on September 14, 2015. Complaint ¶¶ 19, 26, 33; Ex. 3 at CU_8-16, CU_28-31, CU_48-51, CU_148-149, CU_416, CU_0999.

3.     Ms. Gordillo was eligible for FML based on her employment history with CU.  Ex. 2 pp. 13:15-14:15; Ex. 3 at CU_148-149.

4.     On September 9, 2015, Ms. Gordillo was told that she needed to submit medical documentation by September 24, 2015 supporting her request for intermittent FML in order to care for Nicolette.  Ex. 4, Gordillo Dep. Excerpts, p. 130:1-12; Ex. 3 at CU_148-149.

5.     When Ms. Gordillo asked her supervisor Vince Guarino about FMLA, he sent her to Brooke Motz in the LASP Human Resources department.  Ex. 5, Guarino Dep. Excerpts, p. 40:17-23; Ex. 3 at CU_7. Ms. Motz directly reported to Susan Rogers. Ex. 6, Rogers Dep. Excerpts, pp. 10:11-11:12.

6.     Ms. Motz told Ms. Gordillo to talk to Ms. DeAntoni about her FML request. Ex. 3 at CU_7.

7.      On September 11, 2015, when Susan Rogers told Ms. DeAntoni that Ms. Gordillo was

going to be terminated, Ms. DeAntoni told Ms. Rogers that Ms. Gordillo was trying to get FML

in place, and Ms. Rogers did not ask any questions.  Ex. 2, pp. 28:22-29:25; 32:19-25.

8.      Because Ms. Rogers has the ability to make hiring and firing decisions, it was Ms.

DeAntoni's responsibility to share that Ms. Gordillo was seeking FML, and Ms. DeAntoni felt

this was important context. Ex. 2, p. 38:8-23.

9.      While Ms. DeAntoni cannot recall details, she admitted that Ms. Rogers and her

discussed Ms. Gordillo's request for FML. Ex. 2, pp. 38:24-39:2.  Ms. Rogers has testified that

she didn't ask Ms. DeAntoni why Ms. Gordillo was seeking FML.  Ex. 6, p. 73:10-20.

10.     Ms. DeAntoni spoke with her Human Resources team, the ER team, two or three other

consultants, and her manager about Ms. Gordillo's request for FMLA.  Ex. 2, pp. 41:18-42:15.

11.     On Friday, September 11, 2015, Mr. Guarino emailed Ms. Rogers because he was

worried about what would happen if Ms. Gordillo reported to the SPSC on Monday; he asked

Ms. Rogers whether it would "weaken" their case for termination, since the decision to terminate

had already been made.  Ex. 5, pp. 70:12-73:3; Ex. 3 at CU_101-102.

12.     Ms. Rogers then came in person to talk to Mr. Guarino about his email, and he cannot

remember what she said.  But he never actually asked Ms. Gordillo to report to the SPSC on

Monday.  Ex. 5, p. 73:4-13.

13.     Ms. Rogers had a conversation with Ms. Gordillo in which Ms. Gordillo expressed

concern with moving to the SPSC due to her daughter's health. Ex. 2, p. 39:3-14.

14.     Mr. Siders knows of three other employees, besides Ms. Gordillo, that complained about

mold in the SPSC making them sick.  Ex. 7, Siders Dep. Excerpts, pp. 61:1- 63:11; Ex. 3 at

4

CU_462-464, CU_425.

15.     Mr. Siders ensured that Ms. Rogers was looped in regarding the mold testing of the SPSC, because he felt it was important that she had an awareness of the situation; it was both a HR action and a facility action.  Ex. 7, pp. 49:7-50:4; Ex. 3 at CU_523-525.

16.     The SPSC was tested according to the Industry Standard, which means there was a baseline amount of mold. Even the environmental health firm who did the initial analysis recommends going above and beyond the industry standard testing.  Ex. 7, pp. 55:8-56:3; Ex. 8, Dr. Eric Dorninger Dep. Excerpts, pp. 69:1-25, 71:7-17; Ex. 3 at CU_621.

17.     CU's mold mitigation policy is deficient, and more testing was being recommended as of August 10, 2015.  Ex. 8, p. 88:8-16; Ex. 3 at CU_621.

18.     Ms. Rogers told Ms. Gordillo that the SPSC had been tested many times with negative results and the building was safe. Ex. 6, p. 53:11-15.

19.     In August of 2015, it was determined that CU's Risk Management and Legal should be alerted to "the situation," including the need for ongoing testing, and Mr. Siders requested an update on September 10, 2015.  Ex. 3 at CU_621.

20.     Ms. Gordillo was worried about her own health; she hadn't been tested yet because she was prioritizing Nicolette's treatment, but she was afraid exposure to mold could lead to her being debilitated and unable to care for Nicolette. Ex. 4, pp. 73:15-75:11, 119:23-121:2.

21.     Employees are permitted to ask questions about the terms and conditions of employment. Ex. 6, p. 30:18-25.

22.     After the meeting on September 9, 2015, Ms. Gordillo was waiting for Ms. Rogers to "get back to [her]" regarding more information about the mold remediation efforts at the SPSC;

and on September 14, 2015, having heard nothing from Ms. Rogers, she reached out to CU's Environmental Engineering Program. Ex. 4, pp. 115:10-119:19; Ex. 3 at GORDILLO_363-364.

23.     At the meeting on September 14, 2015, Ms. Gordillo thought the conversation was going to continue and she was surprised to be terminated, because she never said that she refused to move to the SPSC. Ex.3 at CU_211-212; Ex. 4, pp. 133:12-134:15.

24.     Cheryl Haugen submitted her resignation on July 21, 2015, because of the long-standing unresolved water intrusion problem with the SPSC, and because the mold had been making her very sick for months. Ex. 3 at CU_425.

25.     From September 8 through September 14, Mr. Siders was working with Human Resources to lock down Ms. Haugen's resignation. Ex. 3 at CU_426, CU_452-453.

26.     Dr. Dorninger diagnosed Nicolette with Chronic Inflammatory Response Syndrome (CIRS autoimmune) on August 4, 2015.  Ex. 4, pp. 31:9-12; Ex. 8, pp 38:11-13; Ex. 9, Nicolette Gordillo-LaRivere Dep. Excerpts, p. 5:22-25; Ex. 3 at Gordillo_589-94.

27.     CIRS is triggered by biotoxins, which include water-damaged microtoxin molds and fragments.  Biotoxins can affect anyone, but individuals with genetic predispositions are more likely to get sick.  Ex. 8, pp. 18:17-20:7, 22:8-15.

28.     CIRS results when the innate immune system gets triggered into chronic inflammation, and the biggest threat to Nicolette's recovery is exposure to water-damaged buildings. Ex. 8, pp. 15:10-12, 57:15-17.

29.     Because of the CIRS diagnosis, it was necessary to eliminate Nicolette's exposure to water damage, in order for her immune system to normalize and for her to recover.  Ex. 8, p. 58:1-7.

30.     Mold usually transfers through air and inhalation, and that can include breathing in mold spores from contaminated clothes.  Ex. 8, pp. 78:22-79:6.

31.     Cross-contamination from someone who comes home from a moldy workplace was a danger to Nicolette.  Ex. 8, pp. 73:4-74:24, 76:12-77:14, 78:3-5.

32.     Dr. Dorninger told Ms. Gordillo about the dangers of cross-contamination for Nicolette. Ex. 8, p. 77:15-22.

33.     On the Shoemaker protocol, the very first rule is removal of the patient from exposure. Ex. 8, p. 77:24-25.

34.     Dr. Dorninger read the mold testing reports and has about concerns the water damage at the SPSC.  He would like CU to clean it up so that no one gets sick.  Right now, he wouldn't let his kids go to school or work there, and he felt like it was dangerous for Ms. Gordillo to work there because she would be exposing Nicolette to harmful mold.  Ex. 8, pp. 88:18-97:18.

35.     Ms. Gordillo had told Mr. Siders, in August of 2015, that her daughter was diagnosed with "CIRS, chronic inflammatory response syndrome, which is an autoimmune issue that is triggered directly by being in a water-damaged building." Ex. 4, p. 31:18-22, 59:12-61:21.

36.     Ms. Gordillo explained to Mr. Siders what the diagnosis meant. Ex. 4, p. 62:9-13.

37.     Mr. Guarino can't remember whether Ms. Gordillo refused to move.  Ex. 5, p. 105:8-17.

38.     Ms. Rogers insists that she asked Ms. Gordillo why she refused to work in the SPSC, but Ms. Gordillo would not respond, except to say that she refused to work in that building. Ex. 6, pp. 53:16-54:19.

39.     Ms. Gordillo felt that awareness about her daughter's diagnosis was important and could be applicable to other employees and their families, so she shared with everyone at LASP: Ms.

Haugen, Mr. Siders, Directors, receptionists, employees with sick children, and custodians. Ex. 4, pp. 59:12-64:5.

40. When Mr. Guarino told Ms. Gordillo that he planned to relocate her to the SPSC, he could tell by her body language that she was very upset, and this was such an unusual reaction that he felt he had to document it. Ms. Gordillo told Mr. Guarino that she was very upset about being moved to the SPSC. He has no recollection of asking her why she was so upset about this proposal. Ex. 5, pp. 58:25-61:5.

41. On September 9, 2015, Ms. Gordillo told Ms. Rogers that she could not work in a water damaged building due to her daughter's health. Ex. 3 at CU_1000; Ex. 5, p. 63:3-21.

42. After Ms. Rogers and Mr. Guarino talked to Ms. Gordillo about relocating to the SPSC, Ms. Rogers spoke with Mr. Siders, who brought up Nicolette's potential need for an accommodation. Ex. 6, pp. 95:19-96:13.

43. When Ms. Gordillo denied that she was refusing to work in the SPSC, Ms. Rogers said she specifically had notes of the prior conversation, and Ms. Gordillo asked to see those notes. Ms. Rogers refused. Ex. 6, pp. 83:14-91:5.

44. Ms. Rogers denies that Ms. Gordillo asked for documentation about the mold testing or told her about any concerns with SPSC. Ex. 6, p. 54:8-24.

45. Ms. Gordillo spoke with Erin Wood about Nicolette's diagnosis and explained that it was an auto-immune response to a water-damaged building, and Ms. Wood guaranteed that Nicolette wouldn't be working in the SPSC. Ex. 4, pp. 143:5-144:8; Ex. 3 at CU_143-147.

46. The most important thing in Ms. Gordillo's life is her daughter, Nicolette. Ex. 5, p. 46:17-19.

47.     Debbie wanted FML so that she would be available to care for Nicolette following her diagnosis; it is an acceptable use of FML for a parent to care for a child.  Ex. 3 at CU_148-149; Ex. 2, p. 43:16-24.

48.     Nicolette's part time position, in which she worked at the front desk for 2.5 hours once a month, never involved going into the SPSC. Ex. 9, pp. 27:1-9, 32:3-5, 38:14-40:4.

49.     If Ms. Rogers hadn't insisted that Ms. Gordillo be fired, Mr. Guarino would have tried to work something out.  Ex. 5, p. 78:17-22.

## III.     ARGUMENT

### A.  Summary Judgment Standards

Under F.R.C.P. 56, summary judgment is only appropriate if the pleadings, depositions, documents, and answers to the interrogatories, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). It is the moving party's burden to demonstrate the lack of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The record "must be viewed in the light most favorable" to Plaintiff, resolving all ambiguities and drawing all reasonable inferences against Defendant. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The Court must disregard evidence presented by defendants that is contradicted, impeached, or provided by an interested witness. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).

### B.  A Reasonable Jury Could Find That Defendant CU Interfered With Plaintiff's Rights Under The FMLA

#### 1.  Relevant Law

Within five days of an employer learning that an employee has either requested FMLA

leave or that an employee's leave may be for an FMLA-qualifying reason, the employer must notify the employee of the employee's eligibility for FMLA leave. 29 C.F.R. § 825.300(b). The eligibility notice, which may be oral or in writing, must state whether an employee is eligible for FMLA and, if not, the notice must identify at least one reason the employee is not eligible. *Id.* It is an employer's responsibility to designate, if appropriate, an employee's leave as qualifying under the FMLA, and to give notice of the designation to the employee. *Id.* Failure to provide the required notices may constitute interference with FMLA rights, which may subject an employer to liability for the employee's lost compensation and benefits, other monetary relief, equitable relief, or other relief tailored to the harm suffered. *Id.*

To prove FMLA interference under 29 U.S.C. § 2615(a)(1), a plaintiff must show: (i) she was eligible to take FMLA leave; (ii) that an adverse action by her employer interfered with her ability to take that leave; and (iii) that the employer's action was related to the exercise or attempted exercise of the employee's FMLA rights. *Metzler v. Fed Home Loan Bank of Topeka*, 464 F.3d 1164, 1180 (10th Cir. 2006); *Jones v. Denver Pub. Schs.*, 427 F.3d 1315, 1318-19 (10th Cir. 2005). The timing has significant probative force. *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 995, 961 (10th Cir. 2002).

An FMLA interference claim is unlike a retaliation claim, in that the employer's motivation is irrelevant in the interference context. *Metzler*, 464 F.3d at 1180 ("a denial, interference, or restraint of FMLA rights is a violation regardless of the employer's intent") (citing *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 877 (10th Cir. 2004)). Under this theory, a denial, interference, or restraint of FMLA rights is a violation regardless of the employer's intent, *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 877 (10th Cir.2004) (citing *Smith*, 298 F.3d

at 960), and the *McDonnell Douglas* burden-shifting analysis does *not* apply to interference claims, *Smith* 298 F.3d at 963. Typically then, an interference claim arises when an employer takes an adverse employment action against an employee before the employee is allowed to take FMLA leave, while the employee is on leave, or in a way that effectively prevents the employee from resuming work after returning from leave. *Preeson v. Parkview Med. Ctr., Inc.,* Case No. 15-cv-02263-MSK-KMT, 2017 WL 1197298, at *5 (D. Colo. Mar. 30, 2017); *Randazzo v. CH2M Hill, Inc*., Case. No. 13-cv-03276-MSK-KLM, 2014 WL 4697131, at *6 (D. Colo. Sept. 22, 2014).

2.   Disputed Material Facts Exist As To Whether Defendant CU's Termination
Related To Plaintiff's Exercise Or Attempted Exercise Of FMLA Rights

As a preliminary matter, Defendant CU violated 29 C.F.R. § 825.300(b) by failing to notify Plaintiff of her FMLA eligibility within five days of Plaintiff's request. On August 26, 2015, Defendant CU was on notice that Plaintiff was seeking leave that might qualify as FMLA leave. PF #1. Defendant CU did not send an eligibility notice to Plaintiff until September 9, 2015—well after five days from Plaintiff's initial request. PF #2. There is no dispute that Defendant CU improperly delayed in providing eligibility notice to Plaintiff—thus delaying her formal application. A reasonable jury could infer from such a fact that Defendant CU's delay in providing the notice gave Defendant CU enough time to terminate Plaintiff, thus interfering with her FMLA request.

Next, Defendant CU does not dispute Plaintiff's ability to establish the first two elements of Plaintiff's interference claim. Plaintiff was eligible to apply for FMLA and Defendant CU terminated Plaintiff before Plaintiff could exercise her FMLA rights. PF #3. Plaintiff was unable to finish her FMLA application process prior to her termination on September 14, 2015.  PF #4.

With respect to the third element, Plaintiff must show that Defendant CU's termination was related to the exercise or attempted exercise of the employee's FMLA rights. *Metzler,* 464 F.3d at 1180. To do so, Plaintiff must provide evidence of a reason for her termination that involves the FMLA. *Metzler*, 464 F.3d at 1181 (holding FMLA provides no relief if plaintiff offered no reason why termination involved FMLA). And if an employee specifically refuses to argue that she was fired because of her FMLA, an employer's adverse action is not related to the FMLA. *Gunnell*, 152 F.3d at 1262. "An employer can defend against the claim, however, by showing that the employee would have been terminated anyway, i.e., regardless of the request for FMLA leave." *Brown v. ScriptPro, LLC*, 700 F.3d 1222, 1227 (10th Cir. 2012). Should an employer proffer a reason for termination that is unrelated to an employee's FMLA request and an employee does not provide "<u>any</u> evidence to contradict" the employer's explanation of her termination, the third element is not established. *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1009 (10th Cir. 2011) (emphasis added).

Despite Defendant CU's attempt to separate the circumstances surrounding Plaintiff's termination into two separate tracts—one involving the decision to terminate her and the other involving her FMLA request—the circumstances leading to Plaintiff's termination are anything but simple. And the two tracts are indisputably intertwined. Plaintiff has provided sufficient evidence to establish that Defendant CU's decision to terminate her employment involved the FMLA. First, around August 26, 2015, Mr. Guarino directed Plaintiff to speak with Ms. Motz, who directly reported to Ms. Rogers in LASP's Human Resources department. PF #5.  Ms. Motz forwarded Plaintiff to Ms. DeAntoni regarding her FMLA request. PF #6. When Ms. DeAntoni told Ms. Rogers that Plaintiff was pursuing FMLA, Ms. Rogers did not ask for any additional

information, but Ms. DeAntoni had already spoken with numerous other HR employees. PF #7-9. Ms. Rogers was additionally involved in ongoing conversations with Mr. Guarino, Mr. Siders, plus Ms. Gordillo, about Ms. Gordillo's refusal to work in a water-damaged building.  PF #10-11.  Ms. Rogers and Mr. Siders were aware of other employees' complaints about illness attributed to mold in the SPSC, in addition to the need for more environmental testing.  PF #13-18.  All of these facts are related to Ms. Gordillo's attempts to ensure she would be able to care for her daughter.  PF #19.

Moreover, Defendant CU's proffered "legitimate" reason for terminating Plaintiff is incontrovertibly entangled with the same concern justifying Plaintiff's request for FMLA. Defendant CU has characterized Plaintiff's termination as being based on "insubordination." However, Ms. Rogers admitted that it is proper for employees to ask questions about the terms and conditions of their employment. PF #20.  Ms. Gordillo was doing precisely that, asking for more information. PF #19.

When Mr. Guarino wrote an e-mail to Ms. Rogers asking if CU's case would be weakened if Ms. Gordillo were to report to the SPSC, Ms. Rogers quickly went to speak with him in person. PF #10. And then Mr. Guarino never actually asked Ms. Gordillo to report to the SPSC. PF #20.  Defendant is asking for an illogical inference - that Ms. Gordillo was terminated as a result of insubordinately refusing to relocate to the SPSC, while admitting Ms. Gordillo was never told to report there.  During the rush to terminate Ms. Gordillo's employment, Defendant CU was simultaneously handling the resignation of Ms. Haugen, who had resigned specifically because she was sick from exposure to mold in the SPSC.  PF #1-2, 4, 21-22.

In addition to these undisputed facts, there are disputed facts as to whether Defendant CU

knew that Plaintiff's daughter, Nicolette, was diagnosed with CIRS, that Nicolette's condition is worsened by exposure to mold in water-damaged buildings, and whether Plaintiff requested documentation that the mold was remediated in the SPSC prior to moving to the SPSC. PF #23-41. Such disputed facts demonstrate that there are questions of material fact as to whether the reason for Plaintiff's termination involved FML.

Given the SPSC's known issues with mold, it is no surprise that Plaintiff requested additional information about the mold remediation efforts. Simply put, Plaintiff hesitated to move to the SPSC, without additional information, out of concern for her own and her daughter's health, and her daughter's health was the very reason she was requesting FML.

By characterizing Plaintiff's request for additional information about the mold remediation at the SPSC as "insubordination," Defendant claims business judgment. However, that rationale is clouded by disputed material facts that involve Plaintiff's concern for her daughter's health - the same reasons motivating Plaintiff to request leave under the FMLA. Plaintiff's hesitation to move to the SPSC out of concern for her daughter's health and Plaintiff's need for FMLA to take care of her daughter are interrelated. Therefore, the third prong is satisfied.

### 3. Defendant CU's Reliance on Tenth Circuit Precedent Is Misplaced

Defendant CU argues that it would have terminated Plaintiff regardless of whether she filed for FMLA leave, and as a result, under Tenth Circuit precedent, Plaintiff cannot establish the third element of her interference claim. Yet key components of those Tenth Circuit cases are not present here. First, in *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1009 (10th Cir. 2011), the employee did not come forward with "any evidence to contradict" the employer's

explanation for her termination. Here, Plaintiff has shown that there is a genuine dispute of material fact as to whether Plaintiff refused to move to the SPSC. Mr. Guarino prevaricated when asked this question and testified that he does not remember exactly if Plaintiff said she refused to work at the SPSC. PF #42. Ms. Rogers testified that Plaintiff refused. PF #43. And Plaintiff testified that she never refused. PF #19. This dispute is best reserved for a credibility determination made by the jury.

Further, unlike the supervisors in *Campbell*, this is not a case in which those supervising employees who knew about the plaintiff-employee's FMLA request were not involved in the termination decision. 478 F.3d at 1290. Here, Ms. Rogers, Mr. Guarino, and Mr. Siders all knew about Plaintiff's FMLA request and were all involved in the decision to terminate Plaintiff. Moreover, Plaintiff never refused to argue that her FMLA request was unrelated to her termination as was the case in *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1262 (10th Cir. 1998). Here, Plaintiff testified that she believes that her termination was a result of her FLMA request and concern about her daughter's and her own health.

Finally, Defendant CU relies on *Balding v. Sunbelt Steel Tex., Inc.* for the argument that as long as it sincerely believed in its reasons for terminating Plaintiff, Defendant CU's conduct is immune from liability. 718 Fed. Appx. 742, 746 (10th Cir. Mar. 13, 2018) (citing *Dalpiaz*, 760 F.3d at 1134). This is incorrect. *Balding* stands for the proposition that "summary judgment for [an] employer is warranted when there is no genuine dispute of material fact regarding alternative reasons for termination." *Id.* at 746. While the Tenth Circuit recognized that the district court improperly analyzed an FMLA interference claim with a pretext analysis reserved for an FMLA retaliation claim, the court observed that "the two standards are similar enough that

[it was] confident in the court's final analysis." *Id.* There, the Tenth Circuit analyzed whether the employer "honestly believed [their proffered] reasons and acted in good faith upon those beliefs." *Id. Balding* concerned an employer who terminated an employee who had received two written disciplinary notices and who committed a fraudulent misrepresentation to a customer and lied to his supervisors when confronted about the misrepresentation. *Id.* at 744, 746. Based on these facts, there was no genuine dispute of material fact that the employer sincerely believed that it was terminating the employee for misrepresentation and lying. Here, the facts and evidence do no entitle Defendant CU to that same benefit of the doubt.

Instead, it appears that Defendant CU did not act in good faith. The record is replete with evidence that CU was aware of the history of mold at the SPSC and that more testing was needed.  PF #12-16, 22-22. There are inconsistencies as to whether Plaintiff "refused" to work at the SPSC.  PF #11, 19, 36-37, 42-45. Additionally, there are conflicting accounts of what Plaintiff disclosed and requested as she attempted to respond to the proposal that she be relocated.  PF #1-4, 7, 37, 45. Ultimately, Ms. Gordillo was unable to provide or receive additional information because Defendant CU swiftly moved to terminate Plaintiff while her FMLA request was pending.

The Court should deny Defendant CU's request for summary judgment as to Plaintiff's interference claim.

### C. A Reasonable Jury Could Find That Defendant CU Retaliated Against Plaintiff For Seeking FMLA.

1. Relevant Law.

"Retaliation claims under the FMLA are subject to the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)." *Burris v. Novartis Animal*

*Health U.S., Inc.*, 309 Fed. Appx. 241, 244 (10th Cir. 2009) (citing *Metzler*, 464 F.3d at 1170).

"To make out a *prima facie* [FMLA] retaliation claim, [an employee] must show that: (1) she

engaged in a protected activity; (2) her employer took an action that a reasonable employee

would have found materially adverse; and (3) there exists a causal connection between the

protected activity and the adverse action." *Id.* (quoting *Campbell v. Gambro Healthcare, Inc.*,

476 F.3d 1282, 1287 (10th Cir. 2007)). "If the plaintiff does so, then the defendant must offer a

legitimate, non-retaliatory reason for the employment action." *Metzler*, 464 F.3d at 1170. The

plaintiff then bears the ultimate burden of demonstrating the defendant's proffered reason is

pretextual." *Id.*

     2.  <u>Plaintiff Has Set Forth A *Prima Facie* Case</u>.

     Defendant CU does not contest that Plaintiff can establish the first two elements of her

*prima facie* case. Nonetheless, Plaintiff engaged in protected activity by filing for FMLA and

when Defendant CU terminated Plaintiff, a reasonable employee would have found such

termination as materially adverse. Plaintiff is also able to show a causal connection exists

between Plaintiff's protected activity and the adverse action.

     Defendant CU contends that Plaintiff cannot show a causal connection for the same

reason that she cannot establish her termination was related to her FMLA request. However, as

illustrated above, Plaintiff has provided more than enough evidence to demonstrate a causal

connection between her FMLA request and termination. *See supra* Part III(B)(2)-(3).

     Further, the same evidence supports an inference that Defendant CU acted with bad intent

and a retaliatory motive in terminating Plaintiff. *Campbell*, 478 F.3d at 1287. Defendant CU, and

in particular Mr. Siders, were tired of listening to Plaintiff talk about her daughter's illness and

the mold situation at the SPSC. Despite the remediation efforts at the SPSC, Mr. Siders and

Defendant CU were simultaneously handling both Ms. Haugen's resignation due to concerns

with her mold-related issues caused by her employment at the SPSC and Plaintiff's concerns

about the same issue. And Plaintiff's concerns with mold were twofold. First, Plaintiff requested

FMLA leave to take care of her daughter who was diagnosed with CIRS. PF # 1-2, 4-6.  Second,

Plaintiff was asking questions about the mold remediation efforts. PF #11, 15, 23-33, 35, 37-42.

Plaintiff's concern with her daughter's health underpinned both efforts. As a result, the evidence

supports a reasonable inference that rather than provide Plaintiff with the mold remediation

information that she sought to confirm it was safe for her to work at the SPSC, Defendant CU

terminated Plaintiff. Therefore, Plaintiff has established the third prong of her *prima facie*

retaliation claim.

### 3. Defendant's Reason For Terminating Plaintiff Is Pretextual

"To raise a fact issue of pretext, [the employee] must present evidence of temporal

proximity plus circumstantial evidence of retaliatory motive." *Burris*, 309 Fed. Appx. at 244. "A

plaintiff can demonstrate pretext by showing weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the employer's reasons for its action, which a reasonable fact

finder could rationally find unworthy of credence." *Id.* Evidence of pretext may include, but is

not limited to, prior treatment of the plaintiff, disturbing procedural irregularities, and the use of

subjective criteria." *Id.* (citing *Simms v. Okla. Ex rel. Dep't of Mental Health & Substance Abuse

Servs.*, 165 F.3d 1321, 1328 (10th Cir. 1999)). "While '[m]ere conjecture that the employer's

explanation is a pretext for intentional discrimination is an insufficient basis for denial of

summary judgment[,] *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997), a plaintiff

need not demonstrate that discriminatory reasons motivated the employer's actions to avoid summary judgment." *Id.* The plaintiff need only make out his prima facie case and present evidence sufficient for a reasonable jury to find that the employer's proffered nondiscriminatory reason was unworthy of belief." *Id.* (citing *Morgan*, 108 F.3d at 1321). Here, Defendant CU's nondiscriminatory reason is unworthy of belief.

Defendant CU's sole stated reason for terminating Plaintiff is that she was insubordinate by refusing to work at the SPSC. As demonstrated above, the evidence shows that a genuine dispute of material fact exists as to whether Plaintiff refused to work at the SPSC. PF #11, 19, 36-37, 42-45.  It is inconsistent that Ms. Rogers would explain to Plaintiff that the SPSC was safe and that mold testing had been completed if Plaintiff never expressed concern about mold at the SPSC or asked for documentation. As a result, a reasonable jury could find Defendant CU's proffered nondiscriminatory reason for termination unworthy of belief and Defendant's motivation should be decided by a jury.

## CONCLUSION

For the foregoing reasons, Plaintiff Debbie Gordillo respectfully requests that Defendant the University of Colorado Board of Regents' Motion for Summary Judgment be denied.

Respectfully submitted this 21st day of September, 2018.

*s/  Rachel E. Ellis*
Rachel E. Ellis
Livelihood Law, LLC
3401 Quebec St., Suite 6009
Denver, CO 80207
Phone: (720) 465-6972
ree@livelihoodlaw.com

**CERTIFICATE OF SERVICE**

I certify that on September 21, 2018, the foregoing Plaintiff's Response to Defendant the University of Colorado Board of Regents' Motion for Summary Judgment was filed with the CM/ECF electronic filing system, which will automatically notify Defendants by email as follows:

Erica Weston
erica.weston@cu.edu

Donald A. Kaade
donald.kaade@cu.edu

*s/ Amber Klein*
Amber Klein
