IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Civil Action No. 17–cv–02193–KMT

DEBBIE GORDILLO,

      Plaintiff,

v.

UNIVERSITY OF COLORADO BOARD OF REGENTS, a body corporate,

      Defendant.

---

## ORDER

---

      This matter is before the court on "Defendant the University of Colorado Board of Regents' Motion for Summary Judgment" [Doc. No. 22] ("Mot.") filed August 31, 2018. Plaintiff's Response [Doc. No 24] ("Resp.") was filed on September 21, 2018, and Defendant filed its Reply [Doc. No. 26] on October 5, 2018.

      Plaintiff alleges that her termination by the Defendant in September 2015 interfered with her rights under the Family Medical Leave Act ("FMLA") and was undertaken in retaliation for exercising her rights under the FMLA. Defendant asserts that Ms. Gordillo's termination came about because Plaintiff refused a directive from her employer that she change her duty location and was unrelated to a request she made to receive information about her entitlement to take

family medical leave ("FLM") at a future time.  Defendant the University of Colorado Board of Regents ("University") seeks judgment as a matter of law on both of Plaintiff's claims.[1]

### *LEGAL STANDARDS*

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter."  *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex*, 477 U.S. at 325).  The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(c).  A disputed fact is "material" if "under the substantive law it is essential to the proper disposition of the claim."  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Thomas v. Metropolitan Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (citing *Anderson*, 477 U.S. at 248).

When ruling on a motion for summary judgment, a court may consider only admissible evidence.  *See Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1209–10 (10th Cir. 2010).  The

---

[1] The one charge against Defendant Randy Siders for Intentional Interference with Contract was dismissed on January 17, 2019.  [Doc. No. 27.]

factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Concrete Works*, 36 F.3d at 1517. The following axioms have a bearing on summary judgment disposition—*i.e.*, (1) that "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); (2) "the defendant should seldom if ever be granted summary judgment where his state of mind is at issue and the jury might disbelieve him or his witnesses as to this issue" *id.* at 256; and (3) "the plaintiff, to survive the defendant's motion, need only present evidence from which a jury might return a verdict in his favor." *Id.* 257.

These axioms are not token in nature. Instead, they serve an important purpose of preserving a litigant's Seventh Amendment right to jury trial. *Tolan v. Cotton*, 134 S. Ct. 1861, 1868 (2014) ("It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system.").

### STATEMENT OF UNDISPUTED FACTS

1.      The Laboratory for Atmospheric and Space Physics ("LASP") is a University of Colorado research institute focused on space exploration. This means that LASP scientists define research objectives of space missions, with researchers determining the technology needed to collect the data and answer the scientific questions posed by those space missions. LASP engineers then design and manufacture the necessary spacecraft and instruments. Once spacecraft is launched, LASP manages the day-to-day operations of the mission and delivers scientific data that has been gathered to other scientists, mission sponsors, and to the public. (Mot., Declaration of Randy Siders ("Siders Decl.") [Doc. No. 22-1] ¶ 2.)

2.     LASP operates out of multiple buildings on the Boulder campus, two of which are the LASP Space and Technology Building ("LSTB"), which houses labs, production facilities, and test equipment, along with the high-level computing equipment necessary for mission operations control, and the Space Science Center ("SPSC"), which is primarily an office space, with areas for public presentations.  (Siders Decl. ¶ 3.)

3.     Both buildings were damaged by a flood in September 2013, with the SPSC sustaining more damage than the LSTB.  The flood damage was remediated, and tests run from December 2013 through August 2014 confirmed "normal/safe" levels of mold.  (Siders Decl. ¶ 3.)

4.     The SPSC was tested according to the Industry Standard, which means there may be a baseline amount of mold.  The environmental health firm who did the initial analysis on SPSC recommends going above and beyond the industry standard testing.  (Resp., Plaintiff Fact ("PF") 16; Ex. 7, Video Deposition of Randy Scott Siders, June 22, 2018 ("Siders Dep. Ex.") at pp. 55:8-56:3; Ex. 8, Deposition of Eric Dorninger, July 2, 2018 ("Dorninger Dep. Ex.") at pp. 69:1-25, 71:7-17; Ex. 3 at CU_621.)

5.     In August 2015, it was determined that CU's Risk Management and Legal should be alerted to the need for ongoing testing, and Mr. Siders requested an update on the mold remediation on September 10, 2015.   (Resp, PF 19, Ex. 3 at CU_621.)

6.     The LSTB and the SPSC each have two receptionists.  In addition to their receptionist duties, each of the four receptionists is also responsible for a more specialized form of administrative support.  (Mot., Video Deposition of Randy Scott Siders, June 22, 2018 ("Siders Dep.") [Doc. No. 22-2]at 22:5-7; 24:8-22.)

7.     Because the LSTB houses the technology and equipment used to control spacecraft, some LSTB operations are subject to the International Traffic in Arms Regulations ("ITAR").  ITAR requires stringent control of physical access to the LSTB, particularly as it relates to foreign nationals.  This includes checking in and signing out all visitors during business hours.  After hours, access is by electronic badge.  To ensure this access control, two receptionists sit at the LSTB front desk.  If both receptionists are going to be unavailable for any length of time, another LASP employee must cover the front desk during the other's absence. (Siders Decl. ¶ 4.)

8.     Work in the SPSC is not subject to ITAR.  Visitors to the SPSC are not signed in or escorted.  Two receptionists work in the SPSC, but they are not required to remain at the front desk.  (Siders Decl. ¶ 5.)

9.     LASP hired Plaintiff in the summer of 2014.  (Compl. ¶ 7.)  She was one of the receptionists stationed at the LSTB, and her supervisor was Vince Guarino.  (Compl. ¶ 11.)

10.     Plaintiff's other administrative responsibility was event coordination and support. (Deposition of Debbie Gordillo, June 27, 2018, ("Gordillo Dep.") [Doc. No. 22-5] at 7:1-3.) Before coming to LASP, Plaintiff had worked as an event coordinator and enjoyed that type of work.  (Gordillo Dep. 7:4-10.)  Some of Plaintiff's event coordination and support duties were carried out onsite at events, away from the LSTB reception desk.  (Mot., Defendant Undisputed Fact ("DF") 8.)

11.    In April 2015, LASP was experiencing gaps in coverage of the LSTB's front desk.  (Mot., Ex. 2.)  This was due in part to Plaintiff's responsibilities coordinating events. (Siders Decl. ¶ 6.)[2]

12.    In May 2015, LASP entered into a multi-year partnership with the United Arab Emirates to study the atmosphere of Mars, which caused Mr. Siders and others to anticipate an increase in the number of events and visitors to the LASP facilities.  (Siders Decl. ¶ 7.)

13.    On May 14, 2015, Mr. Siders consulted with Mr. Guarino via e-mail about whether the amount of work would support a new, full-time event support position.  (Mot., Ex. 1, [Doc. No. 22-7].)  Mr. Guarino acknowledged that a full-time position would allow the LSTB front desk staff to "focus more effectively on their desk duties, especially building access," but questioned whether they could "justify[] a full-time person for the foreseeable future in light of the event stream and the costs associated with hiring and maintaining an additional FTE."  (*Id.*)

14.    Mr. Siders shared Mr. Guarino's concern about whether there were enough events for the foreseeable future to justify adding a full-time event support position and, in late June 2015, decided not to budget for that position.  (Mot., Siders Dep. at 100:15-17.)

15.    On July 22, 2015, Mr. Siders convened a meeting with Mr. Guarino and the front desk staff to discuss, among other issues, what he perceived to be "[c]ontinual gaps in coverage at the desk."  He noted that there "[n]eeds to be a continual presence in the general area of the

---

[2] Plaintiff disputes Defendant's undisputed facts #8-9, 11-14, and 16-17, and argues that the facts indicate a "desire to reorganize personnel was not pretextual."  (Resp. at 2.)  This is an argument about inferences to be drawn from facts, not that the facts themselves are disputed.  Therefore, the court accepts Defendant's facts #8-9, 11-14, and 16-17 as undisputed.

front-most desk near the door [at LSTB] in order to control and facilitate access." (Mot, Agenda/Topics, Ex. 3 [Doc. No. 22-9].)

16. Through July and August 2015, Mr. Siders and Mr. Guarino continued to discuss options for addressing the anticipated uptick in visitors that would occur once the academic year started. (Siders Dep. 100:20-23.)

17. Ms. Gordillo's teenaged daughter, Nicolette, was diagnosed with Chronic Inflammatory Response Syndrome (CIRS autoimmune) on August 4, 2015. (Resp., Siders Dep. Ex. 31:9-12; Ex. 8, Dorninger Dep. Ex. pp 38:11-13; Ex. 9, Deposition of Nicolette Gordillo-LaRivere Excerpts, ("Nicolette Dep.") at p. 5:22-25; Ex. 3 at Gordillo_589-94.) CIRS is triggered by biotoxins, which include water-damaged microtoxin molds and fragments. Biotoxins can affect anyone, but individuals with genetic predispositions are more likely to get sick. (Resp., Ex. 8, Dorninger Dep. Ex. pp. 18:17-20:7, 22:8-15.)

18. Ms. Gordillo was worried about her own health although she hadn't been tested for any form of allergy or reaction to biotoxins. (Resp., Ex. 4, Deposition of Debbie Gordillo Excerpts ("Gordillo Dep. Ex.") at pp. 73:15-75:11, 119:23-121:2.)

19. An unrelated employee, Cheryl Haugen submitted her resignation on July 21, 2015, claiming that mold in SPSC was making her sick. (Resp., Ex. 3 at CU_425.)

20. In late August 2015, Ms. Gordillo asked Mr. Guarino how to obtain information about FMLA should she need extra time off work to care for Nicolette should Ms. Gordillo exhaust her paid sick leave. Mr. Guarino referred her to Brooke Motz in the LASP Human Resources Department. (Resp., Ex. 5, Deposition of Vince Carmen Garino, July 13, 2018 ("Guarino Dep. Ex.") at p. 40:17-23; Ex. 3 at CU_7.) In an email dated August 26, 2015, Ms.

Motz told Ms. Gordillo she needed to talk to Ms. DeAntoni in the University's main HR Department about her FML request.  (Resp., Ex. 3 at CU_7.)

21.     Ms. Motz directly reported to Susan Rogers.  (Resp., Ex. 6, Video Deposition of Susan Roberts Excerpts ("Rogers Dep. Ex.") at pp. 10:11-11:12.)

22.     Tracee DeAntoni was the FMLA Specialist on the Employee Relations team, and the person that LASP employees were supposed to go to with FMLA questions.  (Resp., Ex. 2, Video Deposition of Tracee DeAntoni Excerpts, June 15, 2018 ("DeAntoni Dep. Ex.") at p. 11:1-18.)  On August 26, 2015, Ms. DeAntoni received an email communication from Ms. Gordillo indicating she had questions about health insurance and the availability of FML for Ms. Gordillo to take time off work to care for her daughter.  (Resp., Ex. 3, Key Documents at CU_7, CU_29-31, CU_0999; Ex. 2, DeAntoni Dep. Ex. pp. 30:9-32:25.)

23.     Ms. Gordillo was eligible for FML based on her employment history with CU.  (Resp, Ex. 2, DeAntoni Dep. Ex. pp. 13:15-14:15; Ex. 3 at CU_148-149.)

24.     Labor Day, a national holiday, was on September 7, 2015.  Ms. Gordillo first met with Ms. DeAntoni about FML on Thursday, September 3, 2015 and received paperwork to apply for FML on Wednesday, September 9, 2015, the third business day following September 3, 2015.  (Compl. ¶¶ 19, 26, 33; Resp, Ex. 3 at CU_8-16, CU_28-31, CU_48-51, CU_148-149, CU_416, CU_0999.)  On September 9, 2015, when she received the FML paperwork, Ms. Gordillo was told that she needed to submit medical documentation supporting her request for intermittent FML to care for Nicolette by September 24, 2015.  (Resp., Ex. 4, Gordillo Dep. Ex. p. 130:1-12; Ex. 3 at CU_148-149.)

25.     During the processing of Ms. Gordillo's inquiry about FML, Ms. DeAntoni spoke with her Human Resources team, the ER team, two or three other consultants, and her manager about Ms. Gordillo's request.  (Resp., Ex. 2, DeAntoni Dep. Ex. pp. 41:18-42:15.)

26.     On Friday, September 4, 2015, Mr. Guarino emailed Mr. Siders and told Mr. Siders, "I am going to switch Debra [Sparn] to LSTB and Debbie [Gordillo] to SPSC effective September 14, 2015."  (Mot., Ex. 4)  He further stated, "I will inform the two of them of this change this coming Tuesday."  (*Id.*)

27.     Mr. Guarino noted that LASP often had the SPSC receptionist cover for Plaintiff when her event coordinating duties took her away from the LSTB front desk.  Mr. Guarino stated that moving Plaintiff to the SPSC would allow her "greater flexibility to respond to [e]vent needs" because the front-desk requirements at the SPSC are "less restrictive."  (Mot., Ex. 4.)

28.     On the morning of Tuesday, September 8, 2015, following the Monday holiday, at 11:30 a.m., Mr. Guarino told Plaintiff and the SPSC receptionist that their position locations were being swapped.  (Mot., Ex. 5.)

29.     When Mr. Guarino told Ms. Gordillo that he planned to relocate her to the SPSC, she became visibly upset.  Ms. Gordillo told Mr. Guarino that she was very upset about being moved to the SPSC.  He has no recollection of asking her why she was so upset about this decision.  (Resp., Ex. 5, Guarino Dep. Ex. pp. 58:25-61:5.)

30.     Later that day, Plaintiff informed Mr. Guarino that her stomach was upset due to his decision to relocate her at the SPSC.  Plaintiff told Mr. Guarino that his delivery was unprofessional and that she needed to leave before she said something she would regret.  As

Plaintiff left work, she told Mr. Guarino that she was disappointed in him.[3]  (Mot., Ex. 5, email between Vince Guarino and Susan Rogers.)

31.  On September 9, 2015, Mr. Guarino and Susan Rogers, LASP's Human Resources Manager, met with Plaintiff to discuss her interaction with Mr. Guarino the previous day.  (Mot., Ex. 6, Contemporaneous notes of Susan Rogers.)

32.  During this meeting, Plaintiff notified Mr. Guarino and Ms. Rogers that she would not work in a water-damaged building.[4]  (Mot., Ex. 6; Ex. 7.); (Resp., Ex. 3 at CU_1000; Ex. 5, Guarino Dep. Ex. p. 63:3-21.)  Ms. Rogers informed Plaintiff that the SPSC had been tested multiple times over the course of the past two years and the tests indicated that the building was safe for occupancy.  (Mot., Ex. 6); (Resp., Ex. 6, Rogers Dep. Ex. p. 53:11-15.)

33.  On the same day, September 9, 2015, Ms. Gordillo sent a text message to a friend "Nina" saying she was "considering filing a grievance."  (Mot., Ex. 7.)  On September 10, 2019, Ms. Gordillo sent another text message to "Nina" saying, "I delivered the notice that for health reasons I would not be available to work in a water damaged building.  They asked if I had proof I said I did for my daughter but I had not been able to afford the testing for myself yet but that I was sensitive.  They said they would get back to me."  (*Id.*)

---

[3] Plaintiff disputes Defendant's Facts #19 and 21-23 on the basis that "key information is omitted which is necessary *to understand* the details CU was aware of, and Ms. Gordillo's response." This does not create a <u>disputed</u> fact.  Plaintiff's dispute is with interpretation of the facts, not the facts themselves.  Therefore, the court finds that Defendant's Facts #19, 21-23 are undisputed.
[4] Whether Ms. Gordillo explicitly told Mr. Guarino and Ms. Rogers during this meeting that she "refused" to work at SPSC is disputed.  Whether Ms. Gordillo told Mr. Guarino and Ms. Rogers her refusal to work in a water damaged building was due to concern for her daughter's CIRS is disputed.

34.     After the meeting on Wednesday, September 9, 2015, Ms. Rogers' understanding was that Ms. Gordillo was refusing to work in the SPSC, a water damaged building.  On Thursday, September 10, 2015, Ms. Rogers consulted with Katherine Erwin, the campus Deputy Human Resources Officer about the options for continued employment of Ms. Gordillo given her behavior on September 8, 2015 and her refusal to work in "a water damaged building." (Mot., Ex. 8, Rogers' email chronology of events September 14, 2015.)  On the same day, Ms. Rogers briefed Mr. Guarino and Mr. Siders about her conversation with Ms. Erwin, and thereafter Ms. Rogers, Mr. Guarino and Mr. Siders decided to terminate Plaintiff based on insubordination. (Mot., Video Deposition of Susan Rogers, June 15, 2018, "Rogers Dep." [Doc. No. 22-4] at 64:2-9.)

35.     On September 10, 2015, Ms. Rogers drafted a termination letter and began circulating it for signatures.  (Mot, Ex. 8; Rogers Dep. 67:14-17.)

36.     On September 11, 2015, Ms. Rogers contacted the campus Human Resources office for assistance calculating the "comp time" Plaintiff had accrued for Plaintiff's final paycheck.  (Rogers Dep. 73:2-4; Mot., Ex. 10, HR Database Entries for Deb Gordillo.)  Tracee DeAntoni answered the call and at that time informed Ms. Rogers that she had been working with Plaintiff on FMLA request.  (Mot., Rogers Dep. 73:7-9; Video Deposition of Tracee DeAntoni, June 15, 2018 ("DeAntoni Dep.") at 33:22-24).  Ms. DeAntoni informed Ms. Rogers she had been consulting with Plaintiff about FMLA leave—to care for her daughter—since August 28, 2015, when Brook Motz, who works in LASP HR, had referred her.  (Mot., Ex. 11, emails between Debbie Gordillo and Tracee DeAntoni, August 28, 2015.)

37.     Before Ms. DeAntoni told Ms. Rogers about Ms. Gordillo's FML process, Ms. Rogers was unaware any FML request concerning the FMLA had been made by Plaintiff. (Resp., DeAntoni Dep. Ex. 32:21-23; Rogers Dep. Ex. 94:5-6; Mot., Ex. 8; Mot., Ex. 10.)

38.     On Friday, September 11, 2015, Mr. Guarino emailed Ms. Rogers asking Ms. Rogers whether if Ms. Gordillo reported to SPSC on Monday if that would "weaken our case in any way?"  (Resp., Ex. 3 at CU_101-102.)

39.     On Monday, September 14, 2015, Ms. Rogers and Mr. Guarino met with Plaintiff and notified her that she was being terminated for insubordination and refusing to move to the front desk in the SPSC.  (Mot., Ex. 8.)

40.     At the meeting on September 14, 2015, Ms. Gordillo expressed that she was surprised she was being terminated and that she thought there was more discussion to be had. She denied that she refused to move to the SPSC.  (Resp., Ex.3 at CU_211-212.)

41.     On Monday, September 14, 2015, Ms. Gordillo contacted CU's Environmental Engineering Program.  (Resp., Ex. 4, Gordillo Dep. Ex. pp. 115:10-119:19; Ex. 3 at GORDILLO_363-364.)

42.     The person hired to replace Plaintiff worked as a receptionist in the SPSC and had the events assistance responsibility.[5]  (Mot., Siders Dep. 127:4-12.)

42.     Around the time of Plaintiff's termination, Nicolette, Plaintiff's daughter, began working at LASP one evening per month, but did not work in SPSC.  (Mot., Gordillo Dep. 138:4-8.)

---

[5] Plaintiff does not dispute this fact but claims it is immaterial.

*ANALYSIS*

**A.      *Claim One—Interference under the Family and Medical Leave Act, 29 U.S.C. §***
***2611***

The FMLA grants "an eligible employee . . . a total of 12 workweeks of leave during any

12-month period" if the employee is unable to perform the functions of his or her position due to

a serious health condition.  29 U.S.C. § 2612(a)(1)(D).  The FMLA makes it unlawful for any

covered employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise,

any right provided in this subchapter."  29 U.S.C. § 2615(a)(1).  "To make out a prima facie

claim for FMLA interference, a plaintiff must establish (1) that he was entitled to FMLA leave,

(2) that some adverse action by the employer interfered with his right to take FMLA leave, and

(3) that the employer's action was related to the exercise or attempted exercise of his FMLA

rights."  *Jones v. Denver Public Schs.,* 427 F.3d 1315, 1319 (10th Cir.2005); *Teufel v.*

*Sharpshooter Spectrum Venture LLC*, No. 10-CV-02437-WJM-BNB, 2012 WL 161820, at *2

(D. Colo. Jan. 19, 2012).

**1.      *Interference—Eligibility Notice***

"When an employee requests FMLA leave, or when the employer acquires knowledge

that an employee's leave may be for an FMLA–qualifying reason, the employer must notify the

employee of the employee's eligibility to take FMLA leave within five business days, absent

extenuating circumstances."  29 C.F.R. § 825.300.  *See* 29 C.F.R. § 825.300(b)(1)("Employee

eligibility is determined (and notice must be provided) at the commencement of the first instance

of leave for each FMLA—qualifying reason in the applicable 12—month period."  *Teufel*, 2012

WL 161820, at *3.  Failure to follow the notice requirements set forth in the Regulation "may

constitute an interference with, restrain, or denial of the exercise of an employee's FMLA rights,

*id*.; however, an employer will only be liable for damages if an employee suffers harm in the form of loss of compensation and benefits sustained as a direct result of the violation.

Plaintiff began her FMLA inquiry before she actually was requesting any FML leave. Ms. Gordillo had been taking her own paid sick leave when taking Nicolette to the doctor during the diagnosis portion of her daughter's illness. (Undisputed facts # 17 and 18; Resp., Ex. 3, CU_0007.) A few weeks after Nicolette was diagnosed with CIRS, in late August 2015, Ms. Gordillo approached Mr. Guarino to inquire how to go about instituting FML leave should she run out of sufficient paid sick leave to adequately care for her daughter. Ms. Gordillo did not ask Mr. Guarino for leave of any kind at that point; she merely made a request for a contact so she could learn about the particulars of FML leave should she seek such leave in the future.

Mr. Guarino immediately referred Ms. Gordillo to Brook Motz in the LASP Human Resources department, as he was neither empowered nor equipped to help any employee with respect to the parameters of the FMLA. On August 26, 2015, Ms. Gordillo sent an email to Ms. Motz saying, "I was wondering if there is support through FMLA in the case that I were to use up all the sick time I have to care for my daughter Nicolette." (Resp., Ex. 3, CU_0007.) On August 27, 2015, Ms. Motz, who was assigned only to LASP, not to the University of Colorado generally, referred Ms. Gordillo to the University's main HR Department stating, "Tracee (Tracee.Deantoni@colorado.edu) is the person at CU HR that you will want to talk to about getting set up on FMLA. She is great and very helpful. Please reach out to her and let her know what is going on." (*Id*.) On Friday, August 28, 2015, Ms. Gordillo sent an email to Ms. DeAntoni stating, "I may be a bit premature in reaching out for HMLA. I inquired with Brook about it as I have a daughter who has been quite ill and I have been using my sick time to take

her to dr. appts.  I am not sure how the HMLA works for family caretakers." (*Id*.)  Ms. Gordillo

also asked Ms. DeAntoni if "there[is] an insurance advocate that can help me?" (*Id*.)  At this

point, again, Ms. Gordillo is not asking to take FML leave but generally seeking information

about the topic.

In less than an hour, Ms. DeAntoni responded

Hi, Debbie. Thanks for your email.  Would it be easier to talk in person?  I'm
happy to make a trip over there.  It's possible that as a family member providing
care, you will qualify for FML.  It's hard to say without having all the details.  If
you do qualify, FML provides job-protection via unpaid leave.  Such leave would
run concurrently with any paid leave that you have accrued.  And, leave for FML
purposes can be taken intermittently.  Should we schedule a time to talk?

(*Id*. at CU_0008.)  Ms. DeAntoni suggested a morning meeting on September 2, 2015, but Ms.

Gordillo was unable to meet until September 3, 2015.  (*Id*. at CU_0011.)  Ms. DeAntoni met

personally with Ms. Gordillo on September 3, 2015, and prepared and sent the certificate of

eligibility to her on September 9, 2015, three business days later.

Pursuant to 29 C.F.R. § 825.301

An employee giving notice of the need for FMLA leave does not need to
expressly assert rights under the Act or even mention the FMLA to meet his or
her obligation to provide notice, though the employee would need to state a
qualifying reason for the needed leave and otherwise satisfy the notice
requirements set forth in § 825.302 or § 825.303 depending on whether the need
for leave is foreseeable or unforeseeable. An employee giving notice of the need
for FMLA leave must explain the reasons for the needed leave so as to allow the
employer to determine whether the leave qualifies under the Act.

*See* 29 C.F.R. § 825.300(b)(1).

Further, 29 C.F.R. § 825.301(b) requires that as part of the notice of a need for FMLA

leave, the employee must explain the specific reason for needing FMLA leave.  Ms. Gordillo

fully explained the specific reason for potentially needing FML leave and requested

consideration of her eligibility for the same on September 3, 2015, when she met with Ms.

DeAntoni, thus triggering the five-business-day response period.  Five business days from

September 3, 2015 was September 11, 2015.[6]  Therefore, Defendant University of Colorado

Board of Regents responded to Ms. Gordillo's request for FMLA consideration well within the

mandated time period.

### 2. *Interference - Adverse Action*

To establish an FMLA interference claim, Plaintiff must put forward evidence showing

that (1) she was entitled to FMLA leave;(2) the University's adverse termination action

interfered with her right to take FMLA leave; and (3) the adverse action was "related to the

exercise or attempted exercise of [her] FMLA rights."  *Metzler v. Fed. Home Loan Bank of*

*Topeka*, 464 F.3d 1164, 1180 (10th Cir. 2006).  The parties do not dispute, for purposes of this

motion, that Ms. Gordillo was entitled to FMLA leave for the reasons given[7] and that termination

of her employment was an adverse employment action.  Therefore, this action centers on whether

Ms. Gordillo's termination was "related to the exercise or attempted exercise of Mr. Gordillo's

FMLA rights.  Defendant disputes that Ms. Gordillo's termination was related to the plaintiff's

exercise of her FMLA rights.  Therefore, "[t]he crucial inquiry . . . is whether [the plaintiff] has

alleged and presented evidence that there is a causal connection between her termination and her

exercise of FMLA rights . . . ."  *Sasiak v. Select Speciality Hospital-Colorado Springs, Inc.*, No.

---

[6] Considering the intervening weekend and the Labor Day holiday.

[7] Plaintiff had been asked to provide relevant medical record support for Nicolette's illness.  This Order assumes that this could have and would have been accomplished by Ms. Gordillo on or before the deadline to do so.

13-CV-02738-BNB-KLM, 2014 WL 6696957, at *2 (D. Colo. Oct. 8, 2014); *Metzler,* 464 F.3d at 1181.

"A reason for dismissal that is unrelated to a request for an FMLA leave will not support recovery under an interference theory." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 877 (10th Cir. 2004). In short, once a plaintiff has presented evidence supporting the first two factors, "the employer bears 'the burden of proving that an employee, laid off during FMLA leave, would have been dismissed regardless of the employee's request for, or taking of, FMLA leave.' " *Campbell v. Gambro Healthcare, Inc.,* 478 F.3d 1282, 1289 (10th Cir. 2007) (quoting *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 963 (10th Cir. 2002) (29 C.F.R. § 825.216 "validly shifts to the employer the burden of proving that an employee, laid off during FMLA leave, would have been dismissed regardless of the employee's request for, or taking of, FMLA leave."). *See also, Twigg v. Hawker Beechcraft Corp.,* 659 F.3d 987, 1006-07 (10th Cir. 2011).

"[I]n considering an employer's proffered rationale for an adverse employment action that allegedly interfered with an employee's FMLA leave, '[w]hat is important is . . . whether the [employer] terminated [the employee] because it sincerely, even if mistakenly, believed [in the proffered rationale].' " *Balding v. Sunbelt Steel Tex., Inc.*, 718 F. App'x 742, 746 (10th Cir. 2018) (quoting *Dalpiaz v. Carbon Cty.*, 760 F.3d 1126, 1134 (10th Cir. 2014) (alterations in original).

The FMLA's interference provision is "not a strict liability statute." *Metzler*, 464 F.3d at 1180. That is, "an employer is not necessarily liable under the FMLA anytime it fires an employee who has requested or is on FMLA leave." *Twigg*, 659 F.3d 987 at 1006. This is because "an employee who requests FMLA leave would have no greater protection against his or

her employment being terminated for reasons not related to his or her FMLA request than he or she did before submitting the request." *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1262 (10th Cir. 1998).

Here, Defendant has presented undisputed evidence that Mr. Siders and Mr. Guarino had been considering various solutions to the problem with gaps in coverage by the receptionists at the LSTB front desk since at least April 2015. Because of the event support responsibilities inherent in Ms. Gordillo's job description, LSTB's coverage was sometimes down to only one receptionist, who then could not leave for bathroom or other necessary breaks, without calling for outside coverage. (Undisputed Fact # 11.) The situation was going to exacerbate in the fall of 2015 because of a new project, making the situation more critical than before. (Undisputed Fact # 12.) Mr. Siders and Mr. Guarino were discussing various ways to resolve the issue all during the summer of 2015. (Undisputed Facts ## 13-16.) Mr. Siders and Mr. Guarino considered hiring for a new position as an assistant events coordinator, which would take that responsibility away from the LSTB receptionist position (Ms. Gordillo), but determined there was a lack of funding for this solution. (*Id.*) There is no evidence whatsoever to suggest that either Mr. Siders or Mr. Guarino considered termination of Ms. Gordillo as a potential solution to the LTSB reception problem.

The evidence shows that in August 2015, Ms. Gordillo began expressing concern about her daughter's illness and that Ms. Gordillo was taking sick leave to take her to doctors. A jury could infer that Ms. Gordillo's absences in connection with care for her daughter would have created an additional concern for the already undermanned coverage of reception at LSTB. Mr. Guarino also knew by on or about August 26, 2015, that Ms. Gordillo was considering the

potential need to take FMLA leave, which again a jury could infer would create even more absences or gaps in coverage at the front desk of LSTB.

On or about September 4, 2015, Mr. Guarino made his decision to move Ms. Gordillo to SPSC and to move the SPSC receptionist to LSTB so that absences by Ms. Gordillo due to event assistance would not leave the LSTB front desk under-manned. Mr. Guarino communicated his decision and his reasoning behind the decision to Mr. Siders. At that point, the decision to relocate Ms. Gordillo was not a proposal (as characterized by Plaintiff) but rather was an *action* being undertaken by Mr. Guarino with respect to Ms. Gordillo's employment.

Because of the remedial nature of Title VII lawsuits, the Tenth Circuit has broadly defined adverse employment actions. *See Vann v. Sw. Bell Tel. Co.*, 179 F. App'x 491, 496 (10th Cir. 2006); *Stinnett v. Safeway, Inc.,* 337 F.3d 1213, 1217 (10th Cir. 2003) (noting that the phrase "adverse employment action" is to be "liberally" construed). The language of Title VII indicates that such actions generally involve an employer's action that negatively impacts an employee "with respect to his compensation, terms, conditions, or privileges of employment, . . . ." 42 U.S.C. § 2000e-2(a)(1); *see Stinnett,* 337 F.3d at 1217. Mr. Guarino's decision to move Ms. Gordillo to SPSC involved no demotion in salary and no diminishment in Ms. Gordillo's job description. The two buildings were on the same University campus and the receptionists often "covered" for one another as the need arose. Both buildings had been damaged by water during the Boulder flooding in 2013 and both had been remediated, tested and were fully occupied in August to September, 2015. Neither party argues, and the court does not conclude, that the decision to swap locations for the two receptionists was an adverse

employment action against Ms. Gordillo.[8] *See Vann*, 179 F. App'x at 496*; Sanchez v. Denver Pub. Sch*., 164 F.3d 527, 532 (10th Cir. 1998) (transfer of job location that resulted in a longer commute was not an adverse employment action).

On September 8, 2015, Mr. Guarino informed the two receptionists that they were being relocated.  Ms. Gordillo reacted negatively to this decision.  Although whether Ms. Gordillo explicitly refused to relocate to SPSC on Mr. Guarino's direct order is a disputed fact, there is no dispute that Ms. Gordillo (1) was upset about Mr. Guarino's order to switch locations; (2) told Mr. Guarino that her stomach was upset as a result of being informed of the move; (3) told Mr. Guarino that his delivery was unprofessional; (4) told Mr. Guarino and that she needed to leave before she said something she would regret; (5) left work early that day; and (6) told Mr. Guarino that she was disappointed in him.  It also is undisputed that the next day during a meeting with Mr. Guarino and Ms. Rogers concerning Ms. Gordillo's behavior the day before, Ms. Gordillo stated that she refused to work in a water damaged building for health reasons.

After that meeting, Mr. Siders, Ms. Rogers and Mr. Guarino decided to terminate Ms. Gordillo for insubordination, in other words, as a result of Ms. Gordillo's undisputed reaction to a direct order and reassignment from her supervisor, Mr. Guarino.  Of the three persons making the termination decision, the undisputed evidence shows that only Mr. Guarino was aware that Ms. Gordillo had sought information concerning the FMLA.

---

[8] Further, moving Ms. Gordillo's primary location to SPSC, even if adverse to her for other reasons as she seems to argue, would not have interfered with her ability to take FML leave in any way.  In fact, there is a strong inference that changing her location to SPSC, which was not subject to the same intense legal requirements for physical presence as a receptionist as LSTB would have greatly enhanced and promoted her ability to take FML leave as needed to take care of her adult daughter on an intermittent basis.

Colorado adheres to the employment at-will doctrine, which provides that an employee who is hired for an indefinite period of time "is an 'at will employee,' whose employment may be terminated by either party without cause and without notice, and whose termination does not give rise to a cause of action." *Crawford Rehab. Servs., Inc. v. Weissman*, 938 P.2d 540, 546 (Colo. 1997); *Continental Air Lines, Inc. v. Keenan,* 731 P.2d 708, 711 (Colo.1987).[9]  There are, of course, exceptions to the at-will employment relationship, most notably with respect to federal statutes providing for private causes of action against an employer for a termination based on discriminatory or unlawful motives.[10]  In this case, the at-will doctrine could be restrained if the termination of Ms. Gordillo was for the purpose of "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right provided in [the FLMA]" pursuant to 29 U.S.C. § 2615(a)(1).  If the termination was not for the purposes of interfering with Ms. Gordillo's FMLA rights, however, the fact that Ms. Gordillo may have been legitimately (or illegitimately) concerned about mold in the building, that she reasonably (or unreasonably)

---

[9] A basic common-law doctrine is that, in the absence of an explicit contract to the contrary, every employment is presumed to be an "at-will" employment.  *See* C. Summers, *Individual Protection Against Unjust Dismissal: Time for a Statute,* 62 Va.L.Rev. 481, 484 (1976).

[10] Including Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 (1994) (race, color, sex, national origin, and religion); the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 to 12213 (1994) (disability); the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. §§ 621 to 634 (1994); and the Equal Pay Act of 1963, 29 U.S.C. § 206(d) (1994) (gender).  The Colorado General Assembly has also adopted statutory remedies in circumstances where an employee is fired because of disability, race, creed, color, sex, age, national origin, or ancestry. *See* § 24-34-402, 10A C.R.S. (1988 & 1996 Supp.).  Other examples of statutory causes of action for wrongful termination enacted by the General Assembly include the termination of an employee for engaging in lawful activity off the premises of the employer during nonworking hours, *see* § 24-34-402.5, 10A C.R.S. (1996 Supp.); termination of an employee for responding to a jury summons, *see* § 13-71-134, 6A C.R.S. (1996 Supp.); and termination of a person employed by a state agency for providing written evidence or testimony before a committee of the General Assembly regarding waste of public funds, abuse of authority, or mismanagement of any state agency, *see* § 24-50.5-105, 10B C.R.S. (1988).

feared for her own health and that of her daughter from residual mold exposure, that she did (or did not) have any reason to believe there was mold in SPSC, or that she wanted but did not receive environmental reports from her employer is totally irrelevant. As a Colorado employer, Defendant University of Colorado had the right to terminate Ms. Gordillo's employment without cause and without explanation so long as a protective statute as noted above was not implicated. Whether the termination was a good business decision or whether Ms. Gordillo was treated unfairly as a result and whether or not the SPSC actually had unacceptable levels of mold are simply not concerns of a court where there is no private cause of action. Facts, whether disputed or undisputed, showing that Plaintiff's termination was related to her pursuit of FMLA benefits is what is required. Therefore, except to the extent these facts bear on whether Ms. Gordillo's termination was related to the exercise or attempted exercise of her FMLA rights, Undisputed Facts Numbers 20, 21, 32, and 41 are immaterial to the analysis herein.

Here, there is no evidence whatsoever that Ms. Gordillo's termination was related to her inquiry concerning FMLA benefits. Of the three terminating decision makers, only Mr. Guarino was even aware that Ms. Gordillo had possibly sought information about FMLA provisions. Even Mr. Guarino knew only that Ms. Gordillo had requested a contact to whom she could speak about FML leave; there is no evidence to suggest Mr. Guarino knew whether Ms. Gordillo had ever followed up on his suggestion that she contact Ms. Motz. Ms. Gordillo had not requested FML leave, nor had she been denied or questioned about use of her regular sick leave. No notes, emails, database entries or other documents produced during the period of August 26, 2016 and September 14, 2018 reflect that any of the decision-makers in Ms. Gordillo's termination ever mentioned FML except for when, after the termination decision had already been made and the

letter of termination circulated, Ms. Rogers learned through happenstance from Ms. DeAntoni that Ms. Gordillo had requested forms concerning her right under the FMLA and that CU HR was awaiting medical records from Ms. Gordillo to verify her entitlement to FML leave.

The undisputed evidence shows Mr. Guarino's decision to move Ms. Gordillo to the SPSC was based on valid business considerations which had been under review for months before Ms. Gordillo's daughter was diagnosed with CIRS and long before Ms. Gordillo spoke to anyone about FMLA provisions. There is no evidence to dispute that Mr. Guarino's decision to move Ms. Gordillo was made to facilitate her event assistance responsibilities, a part of her job for which Ms. Gordillo had previous experience and was uniquely qualified to handle. And, in fact, had Ms. Gordillo's need to utilize FML actually been considered, a move to SPSC as a receptionist with the same duties, responsibilities and pay but less emphasis on her physical presence would have been beneficial to Ms. Gordillo's use of her FML, not contrary thereto.

The Plaintiff has failed to demonstrate there are any genuine issues of disputed fact which would establish a relationship between her request for FMLA consideration and the decision to terminate her employment, other than the undisputed temporal proximity concerning the timing of Ms. Gordillo's FMLA inquiries. A temporal connection, standing alone however, is insufficient to prevail on a claim of interference with FLMA rights. *Metzler*, 464 F.3d at 1180; *Gunnell,* 152 F.3d at 1262. Therefore, summary judgment in favor of Defendant University is appropriate on Claim One for interference with FMLA.

### B.      Retaliation under the Family and Medical Leave Act, 29 U.S.C. § 2611

The burden of proof for retaliation claims differs from interference claims because the third element of a retaliation claim is evaluated under the *McDonnell Douglas* burden-shifting

framework.  *Metzler,* 464 F.3d at 1172; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  *See Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1135 (10th Cir. 2003).

The FMLA prohibits employers from discriminating against "any individual for opposing any practice made unlawful by this subchapter."  29 U.S.C. § 2615(a)(2).  A claim that an employer has violated § 2615(a)(2) is a retaliation claim.  *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 960 (10th Cir. 2002).  Under the *McDonnell-Douglas* analysis, the plaintiff bears the initial burden of establishing a prima facie case of retaliation."  *Metzler*, 464 F.3d at 1170.  If the plaintiff successfully establishes her prima facie case, the defendant must offer a legitimate, non-retaliatory reason for the employment action.  *Id.*  "The plaintiff then bears the ultimate burden of demonstrating that the defendant's proffered reason is pretextual."  *Id.*

### 1.    *Claim Two—Prima Facie Case of Retaliation*

To state a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in a protected activity; (2) the employer took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity and the adverse action.  *Metzler*, 464 F.3d at 1171.  Again, as discussed *supra*, the decision of Mr. Guarino to move Plaintiff's work location was not materially adverse; however the termination of Ms. Gordillo was an adverse action.  Accordingly, Plaintiff has shown the first two elements of a prima facie case of retaliation based on her termination.  *See Sasiak,* 2014 WL 6696957, at *4.

"To establish the third element . . . [plaintiff] must show a causal connection between her protected activity of taking FMLA leave and [employer's] decision to terminate her

employment." *Metzler*, 464 F.3d at 1171. At the prima facie case stage, the inquiry is "whether the plaintiff has demonstrated that the [employer's] action occurred under circumstances which give rise to an inference of unlawful discrimination." *Id.* (quoting *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002)). An inference of retaliatory motive can be shown by "protected conduct closely followed by adverse action." *Burrus v. United Tel. Co. of Kan., Inc.*, 683 F.2d 339, 343 (10th Cir. 1982). "[T]he closer [the adverse action] occurred to the protected activity, the more likely it will support a showing of causation." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999). "A six-week period between protected activity and adverse action may be sufficient, standing alone, to show causation, but a three-month period, standing alone, is insufficient." *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004). *See also Hartman v. Harrison Sch. Dist. Two,* No. 17-CV-01133-PAB-SKC, 2019 WL 142121, at *4–5 (D. Colo. Jan. 9, 2019).

Even though the Tenth Circuit has repeatedly held that "we have never allowed "even very close temporal proximity [taken alone] to operate as a proxy for the evidentiary requirement that the plaintiff demonstrate pretext," *Campbell,* 478 F.3d at1290, the temporal proximity in this case does satisfy Plaintiff's requirements to present a prima facie case of retaliation, thus shifting the burden to Defendant to demonstrate a legitimate, nonretaliatory reason for its decision to terminate plaintiff. *See Doebele*, 342 F.3d at 1135.

As is clear from the discussion in Section A, *supra*, the Defendant has articulated a nondiscriminatory reason for Ms. Gordillo's termination. The burden thus shifts to the Plaintiff to "show that there is a genuine dispute of material fact as to whether Defendant's reasons for terminating Ms. Gordillo are pretextual." *Id.*

### 2. *Pretext*

Defendant alleges that Plaintiff was terminated because she refused to follow her supervisor's legitimate directive to change her primary work station to the SPSC and her insubordination to Mr. Guarino when she was told of the transfer. Ms. Gordillo "must . . . present evidence of temporal proximity *plus* circumstantial evidence of retaliatory motive" in order to establish pretext. *Campbell*, 478 F.3d 1282 at 1290; *Metzler*, 464 F.3d at 1172 (quotations omitted).

"A plaintiff can demonstrate pretext by showing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's reasons for its action, which a reasonable factfinder could rationally find unworthy of credence." *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (internal citation omitted.). *See also Campbell*, 478 F.3d at 1290.

> A plaintiff typically makes a showing of pretext in one of three ways: (1) with evidence that the defendant's stated reason for the adverse employment action was false, (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances, or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff.

*Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000) (internal citations omitted); *Hartman,* 2019 WL 142121, at *5.

Pretext depends on the facts <u>as they appear to the person making the decision</u>; a good-faith belief "would not be pretextual even if the belief was later found to be erroneous." *Rowe v. United Airlines, Inc.*, 608 F. App'x 596, 600 (10th Cir. 2015); *Dewitt,* 845 F.3d at 1307.

The Tenth Circuit articulated it as follows:

> In an employment case, it is not our position to judge whether an employer's "proffered reasons were wise, fair[,] or correct, but whether [it] honestly believed those reasons and acted in good faith upon those beliefs."

*Rowe*, 608 F. App'x 596 at 600 (quoting *Rivera v. City & Cty. of Denver,* 365 F.3d 912, 924–25 (10th Cir. 2004)) (alterations in original).

If Plaintiff can show pretext on the part of the Defendant, the burden shifts again to Defendant, as the party moving for summary judgment, to show the absence of a genuine issue of material fact and an entitlement to judgment as a matter of law.

In response to Defendant's claimed reasons supporting the decision to fire Ms. Gordillo when she was insubordinate and Mr. Guarino and Ms. Rogers believed she refused to work in SPSC, Ms. Gordillo proffers numerous facts supporting her argument that the SPSC was not safe for her to work in. (*See* Plaintiff's Facts ## 16, 17, 19, 20, 22, 24, 44 [concerning water remediation], and ## 26-34, 45 [concerning the dangers of mold exposure to persons].) However, these facts, whether disputed or undisputed, do not address the issue of pretext, but rather attempt to explain or rationalize Ms. Gordillo's dissatisfaction with being reassigned to work in the SPCS. This logic misses the mark in this case.

A decision had been made by Ms. Gordillo's superiors to move the position of the events support receptionist to a different building where the physical presence of the receptionist at a front desk was not as critical. This decision was made because the events support receptionist was required to be away from his or her assigned front desk more frequently than the other front desk receptionists and the LSTB was a higher security building than the SPSC, requiring more consistent receptionist presence. The decision was not made on the bases of any individual

employee, but rather on the basis of the job requirements for the <u>position</u>.[11]  It is also undisputed

that the issue concerning gaps in coverage at the front desk of LSTB as a result of the events

support receptionist's other duties had been discussed and debated for months before Plaintiff

engaged in the protected activity of requesting FMLA consideration.

Certainly, it is an employee's right to "ask questions about the terms and conditions of

employment" (Plaintiff's Fact #21) and to decide for herself whether to discontinue her

employment if the conditions are unacceptable to her for any reason, whether legitimate or not.

However, Ms. Gordillo cannot meet her burden to establish <u>pretext</u> on the part of the Defendant

by simply alleging facts that only serve to justify her personal opposition to moving to the front

desk at SPSC.  Whether Ms. Gordillo's opposition to the move was reasonable or not is not the

issue.  The issue is whether Plaintiff's refusal, as perceived by Mr. Guarino and Ms. Rogers, to

relocate as directed to do so by her boss, was the reason she was terminated, or if there was a

hidden motive to terminate her because of her request to be considered for FMLA leave at some

future time if necessary.

The evidence shows that even though Ms. Gordillo disputes that she explicitly refused to

work at the SPSC, she does not and cannot dispute that she told Ms. Rogers and Mr. Guarino that

she would not work in a water damaged building, that she considered SPSC to be such a water

damaged building, and that Ms. Rogers understood Ms. Gordillo to be refusing to work in

SPSC.[12]  Ms. Rogers testified that she believed Plaintiff would not move; Ms. Rogers'

---

[11] It is undisputed that the employee hired to replace Plaintiff as the events support receptionist
was located in the SPSC.
[12] Plaintiff even now admits "Plaintiff hesitated to move to the SPSC, without additional
information, out of concern for her own and her daughter's health." (Resp. at 14.)

contemporaneous notes taken during the meeting with Plaintiff reflect this understanding as well. (Mot., Rogers Dep. 54:9-12; Ex. 6). Further, Plaintiff herself, in texting a friend the morning after her meeting with Mr. Guarino and Ms. Rogers, admitted that: "I delivered the notice that for health reasons I would not be available to work in a water damaged building." (Mot., Ex. 7.)

There is some evidence that Mr. Guarino may have considered Ms. Gordillo's reaction to the transfer to be less emphatic than did Ms. Rogers. Although Mr. Guarino testified he thought Ms. Gordillo was refusing to work in SPSC (Mot., Guarino Dep. 67:4-5), Mr. Guarino made inquiry of Ms. Rogers about how the termination of Ms. Gordillo might be affected if she actually reported for duty on September 14, 2015 to the SPSC. (Resp., Ex. 3 at CU_101-02.) A reasonable inference is that Mr. Guarino believed it possible that Ms. Gordillo had not explicitly refused to work in SPSC, but rather that she was seeking additional assurances about the safety of the building before committing to the move, as she claims. This fact, however, resolved in favor of the Plaintiff for purposes of this Order, is simply immaterial to the questions before the court.

First, since her employments was "at-will," Ms. Gordillo's termination could have been made for any non-prohibited reason, such as Ms. Gordillo's demanding certain compliance from her employer before she would follow a direct order to relocate. Second, to prove pretext, Plaintiff must present evidence that the employer did not really believe its proffered reasons for the adverse action and "thus may have been pursuing a hidden discriminatory agenda." *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017). Ms. Gordillo has presented no evidence to support this conclusion. All the evidence shows that Ms. Gordillo was being fired because the University took umbrage at her reaction to the order to relocate, considering it to constitute

insubordination.  Whether Ms. Gordillo's reaction was to demand proof that the SPSC was free

of mold before she would follow the direct orders of her supervisor or whether it was an out-and-

out refusal to move is irrelevant.  It is likewise irrelevant whether the University's reaction to

Ms. Gordillo's behavior was reasonable.  The bottom line in the pretext inquiry is that there is

simply no evidence whatsoever to suggest that Ms. Gordillo's termination was based on a hidden

discriminatory reason, to wit: her FMLA inquiry.

Therefore, Defendant is entitled to judgment as a matter of law on Claim Two,

Retaliation under the FMLA.

It is therefore **ORDERED** that "Defendant the University of Colorado Board of Regents'

Motion for Summary Judgment" [Doc. No. 22] is **GRANTED**.  Judgment shall enter in favor of

the Defendant University of Colorado Board of Regents on all claims and this case shall be

closed.

It is further **ORDERED** that Defendants are awarded their costs to be taxed by the Clerk

of Court in the time and manner prescribed by Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR

54.1.

Dated this 2nd day of April, 2019.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge